# JOHNSON *v.* TRANSPORTATION AGENCY, SANTA CLARA COUNTY, CALIFORNIA, ET AL.

No. 85–1129.   Argued November 12, 1986—Decided March 25, 1987

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 642. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 647. WHITE, J., filed a dissenting opinion, *post*, p. 657. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, and in Parts I and II of which WHITE, J., joined, *post*, p. 657.

*Constance E. Brooks* argued the cause for petitioner. With her on the briefs was *James L. Dawson.*

*Steven Woodside* argued the cause for respondents. With him on the brief for respondent Transportation Agency, Santa Clara County, California, were *Ann Miller Ravel, James Rumble,* and *Morris J. Baller. David A. Rosenfeld* filed a brief for respondent Service Employees International Union Local 715.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Carvin, Roger Clegg,* and *David K. Flynn;* for the Mid-Atlantic Legal Foundation by *Richard B. McGlynn* and *Douglas Foster;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun, John H. Findley,* and *Anthony T. Caso.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *Marian M. Johnston,*

Justice Brennan delivered the opinion of the Court.

Respondent, Transportation Agency of Santa Clara County, California, unilaterally promulgated an Affirmative Action Plan applicable, *inter alia*, to promotions of employees. In selecting applicants for the promotional position of road dispatcher, the Agency, pursuant to the Plan, passed over petitioner Paul Johnson, a male employee, and promoted a female employee applicant, Diane Joyce. The question for decision is whether in making the promotion the Agency impermissibly took into account the sex of the applicants in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*[1] The District Court for the

Supervising Deputy Attorney General, *Beverly Tucker*, Deputy Attorney General, *Jim Jones*, Attorney General of Idaho, *William J. Guste, Jr.*, Attorney General of Louisiana, *Stephen H. Sachs*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Robert M. Spire*, Attorney General of Nebraska, *Robert Abrams*, Attorney General of New York, *David Frohnmayer*, Attorney General of Oregon, *Bronson C. La Follette*, Attorney General of Wisconsin, and *Elisabeth S. Shuster;* for the American Federation of Labor and Congress of Industrial Organizations by *David Silberman* and *Laurence Gold;* for the American Society for Personnel Administration by *Lawrence Z. Lorber* and *J. Robert Kirk;* for the National League of Cities et al. by *Cynthia M. Pols, John J. Gunther, Carolyn F. Corwin, Bruce N. Kuhlik,* and *Frederic Lee Ruck;* and for the NOW Legal Defense and Education Fund et al. by *Marsha Levick, Emily J. Spitzer,* and *Judith L. Lichtman.*

Briefs of *amici curiae* were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* for the city of Detroit et al. by *Daniel B. Edelman, James R. Murphy, Charles L. Reischel, Frederick N. Merkin,* and *Robert Cramer;* and for the Lawyers' Committee for Civil Rights Under Law et al. by *Harold R. Tyler, Jr., James Robertson, Norman Redlich, William L. Robinson, Richard T. Seymour, James D. Crawford, Antonia Hernandez, Grover G. Hankins,* and *Kenneth Kimerling.*

[1] Section 703(a) of the Act, 78 Stat. 255, as amended, 86 Stat. 109, 42 U. S. C. § 2000e–2(a), provides that it "shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

Northern District of California, in an action filed by petitioner following receipt of a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), held that respondent had violated Title VII. App. to Pet. for Cert. 1a. The Court of Appeals for the Ninth Circuit reversed. 770 F. 2d 752 (1985). We granted certiorari, 478 U. S. 1019 (1986). We affirm.[2]

I

A

In December 1978, the Santa Clara County Transit District Board of Supervisors adopted an Affirmative Action Plan (Plan) for the County Transportation Agency. The Plan implemented a County Affirmative Action Plan, which had been adopted, declared the County, because "mere prohibition of discriminatory practices is not enough to remedy the effects of past practices and to permit attainment of an equitable representation of minorities, women and handicapped persons." App. 31.[3] Relevant to this case, the Agency Plan provides that, in making promotions to positions within a traditionally segregated job classification in which women have

---

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

[2] No constitutional issue was either raised or addressed in the litigation below. See 770 F. 2d 752, 754, n. 1 (1985). We therefore decide in this case only the issue of the prohibitory scope of Title VII. Of course, where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause. See *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986).

[3] The Plan reaffirmed earlier County and Agency efforts to address the issue of employment discrimination, dating back to the County's adoption in 1971 of an Equal Employment Opportunity Policy. App. 37-40.

been significantly underrepresented, the Agency is authorized to consider as one factor the sex of a qualified applicant.

In reviewing the composition of its work force, the Agency noted in its Plan that women were represented in numbers far less than their proportion of the County labor force in both the Agency as a whole and in five of seven job categories. Specifically, while women constituted 36.4% of the area labor market, they composed only 22.4% of Agency employees. Furthermore, women working at the Agency were concentrated largely in EEOC job categories traditionally held by women: women made up 76% of Office and Clerical Workers, but only 7.1% of Agency Officials and Administrators, 8.6% of Professionals, 9.7% of Technicians, and 22% of Service and Maintenance Workers. As for the job classification relevant to this case, none of the 238 Skilled Craft Worker positions was held by a woman. *Id.*, at 49. The Plan noted that this underrepresentation of women in part reflected the fact that women had not traditionally been employed in these positions, and that they had not been strongly motivated to seek training or employment in them "because of the limited opportunities that have existed in the past for them to work in such classifications." *Id.*, at 57. The Plan also observed that, while the proportion of ethnic minorities in the Agency as a whole exceeded the proportion of such minorities in the County work force, a smaller percentage of minority employees held management, professional, and technical positions.[4]

The Agency stated that its Plan was intended to achieve "a statistically measurable yearly improvement in hiring, training and promotion of minorities and women throughout the Agency in all major job classifications where they are underrepresented." *Id.*, at 43. As a benchmark by which to evaluate progress, the Agency stated that its long-term goal was to attain a work force whose composition reflected the pro-

[4] While minorities constituted 19.7% of the County labor force, they represented 7.1% of the Agency's Officials and Administrators, 19% of its Professionals, and 16.9% of its Technicians. *Id.*, at 48.

portion of minorities and women in the area labor force. *Id.*, at 54. Thus, for the Skilled Craft category in which the road dispatcher position at issue here was classified, the Agency's aspiration was that eventually about 36% of the jobs would be occupied by women.

The Plan acknowledged that a number of factors might make it unrealistic to rely on the Agency's long-term goals in evaluating the Agency's progress in expanding job opportunities for minorities and women. Among the factors identified were low turnover rates in some classifications, the fact that some jobs involved heavy labor, the small number of positions within some job categories, the limited number of entry positions leading to the Technical and Skilled Craft classifications, and the limited number of minorities and women qualified for positions requiring specialized training and experience. *Id.*, at 56–57. As a result, the Plan counseled that short-range goals be established and annually adjusted to serve as the most realistic guide for actual employment decisions. Among the tasks identified as important in establishing such short-term goals was the acquisition of data "reflecting the ratio of minorities, women and handicapped persons who are working in the local area in major job classifications relating to those utilized by the County Administration," so as to determine the availability of members of such groups who "possess the desired qualifications or potential for placement." *Id.*, at 64. These data on qualified group members, along with predictions of position vacancies, were to serve as the basis for "realistic yearly employment goals for women, minorities and handicapped persons in each EEOC job category and major job classification." *Ibid.*

The Agency's Plan thus set aside no specific number of positions for minorities or women, but authorized the consideration of ethnicity or sex as a factor when evaluating qualified candidates for jobs in which members of such groups were poorly represented. One such job was the road dispatcher position that is the subject of the dispute in this case.

## B

On December 12, 1979, the Agency announced a vacancy for the promotional position of road dispatcher in the Agency's Roads Division. Dispatchers assign road crews, equipment, and materials, and maintain records pertaining to road maintenance jobs. *Id.*, at 23–24. The position requires at minimum four years of dispatch or road maintenance work experience for Santa Clara County. The EEOC job classification scheme designates a road dispatcher as a Skilled Craft Worker.

Twelve County employees applied for the promotion, including Joyce and Johnson. Joyce had worked for the County since 1970, serving as an account clerk until 1975. She had applied for a road dispatcher position in 1974, but was deemed ineligible because she had not served as a road maintenance worker. In 1975, Joyce transferred from a senior account clerk position to a road maintenance worker position, becoming the first woman to fill such a job. Tr. 83–84. During her four years in that position, she occasionally worked out of class as a road dispatcher.

Petitioner Johnson began with the County in 1967 as a road yard clerk, after private employment that included working as a supervisor and dispatcher. He had also unsuccessfully applied for the road dispatcher opening in 1974. In 1977, his clerical position was downgraded, and he sought and received a transfer to the position of road maintenance worker. *Id.*, at 127. He also occasionally worked out of class as a dispatcher while performing that job.

Nine of the applicants, including Joyce and Johnson, were deemed qualified for the job, and were interviewed by a two-person board. Seven of the applicants scored above 70 on this interview, which meant that they were certified as eligible for selection by the appointing authority. The scores awarded ranged from 70 to 80. Johnson was tied for second

with a score of 75, while Joyce ranked next with a score of 73. A second interview was conducted by three Agency supervisors, who ultimately recommended that Johnson be promoted. Prior to the second interview, Joyce had contacted the County's Affirmative Action Office because she feared that her application might not receive disinterested review.[5] The Office in turn contacted the Agency's Affirmative Action Coordinator, whom the Agency's Plan makes responsible for, *inter alia*, keeping the Director informed of opportunities for the Agency to accomplish its objectives under the Plan. At the time, the Agency employed no women in any Skilled Craft position, and had never employed a woman as a road dispatcher. The Coordinator recommended to the Director of the Agency, James Graebner, that Joyce be promoted.

Graebner, authorized to choose any of the seven persons deemed eligible, thus had the benefit of suggestions by the second interview panel and by the Agency Coordinator in arriving at his decision. After deliberation, Graebner con-

---

[5] Joyce testified that she had had disagreements with two of the three members of the second interview panel. One had been her first supervisor when she began work as a road maintenance worker. In performing arduous work in this job, she had not been issued coveralls, although her male co-workers had received them. After ruining her pants, she complained to her supervisor, to no avail. After three other similar incidents, ruining clothes on each occasion, she filed a grievance, and was issued four pairs of coveralls the next day. Tr. 89–90. Joyce had dealt with a second member of the panel for a year and a half in her capacity as chair of the Roads Operations Safety Committee, where she and he "had several differences of opinion on how safety should be implemented." *Id.*, at 90–91. In addition, Joyce testified that she had informed the person responsible for arranging her second interview that she had a disaster preparedness class on a certain day the following week. By this time about 10 days had passed since she had notified this person of her availability, and no date had yet been set for the interview. Within a day or two after this conversation, however, she received a notice setting her interview at a time directly in the middle of her disaster preparedness class. *Id.*, at 94–95. This same panel member had earlier described Joyce as a "rebel-rousing, skirt-wearing person," *id.*, at 153.

cluded that the promotion should be given to Joyce. As he testified: "I tried to look at the whole picture, the combination of her qualifications and Mr. Johnson's qualifications, their test scores, their expertise, their background, affirmative action matters, things like that. . . . I believe it was a combination of all those." *Id.*, at 68.

The certification form naming Joyce as the person promoted to the dispatcher position stated that both she and Johnson were rated as well qualified for the job. The evaluation of Joyce read: "Well qualified by virtue of 18 years of past clerical experience including 3½ years at West Yard plus almost 5 years as a [road maintenance worker]." App. 27. The evaluation of Johnson was as follows: "Well qualified applicant; two years of [road maintenance worker] experience plus 11 years of Road Yard Clerk. Has had previous outside Dispatch experience but was 13 years ago." *Ibid.* Graebner testified that he did not regard as significant the fact that Johnson scored 75 and Joyce 73 when interviewed by the two-person board. Tr. 57–58.

Petitioner Johnson filed a complaint with the EEOC alleging that he had been denied promotion on the basis of sex in violation of Title VII. He received a right-to-sue letter from the EEOC on March 10, 1981, and on March 20, 1981, filed suit in the United States District Court for the Northern District of California. The District Court found that Johnson was more qualified for the dispatcher position than Joyce, and that the sex of Joyce was the *"determining factor* in her selection." App. to Pet. for Cert. 4a (emphasis in original). The court acknowledged that, since the Agency justified its decision on the basis of its Affirmative Action Plan, the criteria announced in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), should be applied in evaluating the validity of the Plan. App. to Pet. for Cert. 5a. It then found the Agency's Plan invalid on the ground that the evidence did not satisfy *Weber*'s criterion that the Plan be temporary. App. to Pet. for Cert. 6a. The Court of Appeals for the Ninth Circuit re-

versed, holding that the absence of an express termination date in the Plan was not dispositive, since the Plan repeatedly expressed its objective as the attainment, rather than the maintenance, of a work force mirroring the labor force in the County. 770 F. 2d, at 756. The Court of Appeals added that the fact that the Plan established no fixed percentage of positions for minorities or women made it less essential that the Plan contain a relatively explicit deadline. 770 F. 2d, at 757. The Court held further that the Agency's consideration of Joyce's sex in filling the road dispatcher position was lawful. The Agency Plan had been adopted, the court said, to address a conspicuous imbalance in the Agency's work force, and neither unnecessarily trammeled the rights of other employees, nor created an absolute bar to their advancement. *Id.*, at 757–759.

## II

As a preliminary matter, we note that petitioner bears the burden of establishing the invalidity of the Agency's Plan. Only last Term, in *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 277–278 (1986), we held that "[t]he ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program," and we see no basis for a different rule regarding a plan's alleged violation of Title VII. This case also fits readily within the analytical framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973). Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of

pretext by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

The assessment of the legality of the Agency Plan must be guided by our decision in *Weber, supra*.[6] In that case, the

---

[6] JUSTICE SCALIA's dissent maintains that the obligations of a public employer under Title VII must be identical to its obligations under the Constitution, and that a public employer's adoption of an affirmative action plan therefore should be governed by *Wygant*. This rests on the following logic: Title VI embodies the same constraints as the Constitution; Title VI and Title VII have the same prohibitory scope; therefore, Title VII and the Constitution are coterminous for purposes of this case. The flaw is with the second step of the analysis, for it advances a proposition that we explicitly considered and rejected in *Weber*. As we noted in that case, Title VI was an exercise of federal power "over a matter in which the Federal Government was already directly involved," since Congress "was legislating to assure federal funds would not be used in an improper manner." 443 U. S., at 206, n. 6. "Title VII, by contrast, was enacted pursuant to the commerce power to regulate purely private decisionmaking and was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments. Title VII and Title VI, therefore, cannot be read *in pari materia.*" *Ibid.* This point is underscored by Congress' concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII. As a result, Congress added § 604 to Title VI, 78 Stat. 253, as set forth in 42 U. S. C. § 2000d-3, which provides:

"Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."

The sponsor of this section, Senator Cooper, stated that it was designed to clarify that "it was not intended that [T]itle VI would impinge on [T]itle VII." 110 Cong. Rec. 11615 (1964).

While public employers were not added to the definition of "employer" in Title VII until 1972, there is no evidence that this mere addition to the definitional section of the statute was intended to transform the substantive

Court addressed the question whether the employer violated Title VII by adopting a voluntary affirmative action plan designed to "eliminate manifest racial imbalances in traditionally segregated job categories." *Id.*, at 197. The respondent employee in that case challenged the employer's denial of his application for a position in a newly established craft training program, contending that the employer's selection process impermissibly took into account the race of the applicants. The selection process was guided by an affirmative action plan, which provided that 50% of the new trainees were to be black until the percentage of black skilled craftworkers in the employer's plant approximated the percentage of blacks in the local labor force. Adoption of the plan had been prompted by the fact that only 5 of 273, or 1.83%, of skilled craftworkers at the plant were black, even though the work force in the area was approximately 39% black. Because of the historical exclusion of blacks from craft positions, the employer regarded its former policy of hiring trained outsiders as inadequate to redress the imbalance in its work force.

We upheld the employer's decision to select less senior black applicants over the white respondent, for we found that taking race into account was consistent with Title VII's objective of "break[ing] down old patterns of racial segregation and hierarchy." *Id.*, at 208. As we stated:

> "It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long' consti-

---

standard governing employer conduct. Indeed, "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." *Dothard* v. *Rawlinson*, 433 U. S. 321, 332, n. 14 (1977). The fact that a public employer must also satisfy the Constitution does not negate the fact that the *statutory* prohibition with which that employer must contend was not intended to extend as far as that of the Constitution.

tuted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." *Id.*, at 204 (quoting remarks of Sen. Humphrey, 110 Cong. Rec. 6552 (1964)).[7]

---

[7]JUSTICE SCALIA's dissent maintains that *Weber*'s conclusion that Title VII does not prohibit voluntary affirmative action programs "rewrote the statute it purported to construe." *Post*, at 670. *Weber*'s decisive rejection of the argument that the "plain language" of the statute prohibits affirmative action rested on (1) legislative history indicating Congress' clear intention that employers play a major role in eliminating the vestiges of discrimination, 443 U. S., at 201–204, and (2) the language and legislative history of § 703(j) of the statute, which reflect a strong desire to preserve managerial prerogatives so that they might be utilized for this purpose. *Id.*, at 204–207. As JUSTICE BLACKMUN said in his concurrence in *Weber*, "[I]f the Court has misperceived the political will, it has the assurance that because the question is statutory Congress may set a different course if it so chooses." *Id.*, at 216. Congress has not amended the statute to reject our construction, nor have any such amendments even been proposed, and we therefore may assume that our interpretation was correct.

JUSTICE SCALIA's dissent faults the fact that we take note of the absence of congressional efforts to amend the statute to nullify *Weber*. It suggests that congressional inaction cannot be regarded as acquiescence under all circumstances, but then draws from that unexceptional point the conclusion that *any* reliance on congressional failure to act is necessarily a "canard." *Post*, at 672. The fact that inaction may not always provide crystalline revelation, however, should not obscure the fact that it may be probative to varying degrees. *Weber*, for instance, was a widely publicized decision that addressed a prominent issue of public debate. Legislative inattention thus is not a plausible explanation for congressional inaction. Furthermore, Congress not only passed no contrary legislation in the wake of *Weber*, but not one legislator even proposed a bill to do so. The barriers of the legislative process therefore also seem a poor explanation for failure to act. By contrast, when Congress has been displeased with our interpretation of Title VII, it has not hesitated to amend the statute to tell us so. For instance, when Congress passed the Pregnancy Discrimination Act of 1978, 42 U. S. C. § 2000e(k), "it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in [*General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976)]." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678 (1983). Surely, it is appropriate to find some probative value in such radically

We noted that the plan did not "unnecessarily trammel the interests of the white employees," since it did not require "the discharge of white workers and their replacement with new black hirees." 443 U. S., at 208. Nor did the plan create "an absolute bar to the advancement of white employees," since half of those trained in the new program were to be white. *Ibid.* Finally, we observed that the plan was a temporary measure, not designed to maintain racial balance, but to "eliminate a manifest racial imbalance." *Ibid.* As JUSTICE BLACKMUN's concurrence made clear, *Weber* held that an employer seeking to justify the adoption of a plan need not point to its own prior discriminatory practices, nor even to evidence of an "arguable violation" on its part. *Id.*, at 212. Rather, it need point only to a "conspicuous . . . imbalance in traditionally segregated job categories." *Id.*, at 209. Our decision was grounded in the recognition that voluntary employer action can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimination in the workplace, and that Title VII should not be read to thwart such efforts. *Id.*, at 204.[8]

---

different congressional reactions to this Court's interpretations of the same statute.

As one scholar has put it, "When a court says to a legislature: 'You (or your predecessor) meant X,' it almost invites the legislature to answer: 'We did not.'" G. Calabresi, A Common Law for the Age of Statutes 31–32 (1982). Any belief in the notion of a dialogue between the judiciary and the legislature must acknowledge that on occasion an invitation declined is as significant as one accepted.

[8] See also *Firefighters* v. *Cleveland,* 478 U. S. 501, 515 (1986) ("We have on numerous occasions recognized that Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII"); *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving [Title VII's] goal"). JUSTICE SCALIA's suggestion that an affirmative action program may be adopted only to redress an employer's past discrimination, see *post,* at 664–665, was rejected in *Steelworkers* v. *Weber,* 443 U. S. 193 (1979), because the prospect of liability created by such an admission would create a significant disincentive for voluntary ac-

In reviewing the employment decision at issue in this case, we must first examine whether that decision was made pursuant to a plan prompted by concerns similar to those of the employer in *Weber*. Next, we must determine whether the effect of the Plan on males and nonminorities is comparable to the effect of the plan in that case.

The first issue is therefore whether consideration of the sex of applicants for Skilled Craft jobs was justified by the existence of a "manifest imbalance" that reflected underrepresentation of women in "traditionally segregated job categories." *Id.*, at 197. In determining whether an imbalance exists that would justify taking sex or race into account, a

---

tion. As JUSTICE BLACKMUN's concurrence in that case pointed out, such a standard would "plac[e] voluntary compliance with Title VII in profound jeopardy. The only way for the employer and the union to keep their footing on the 'tightrope' it creates would be to eschew all forms of voluntary affirmative action." *Id.*, at 210. Similarly, JUSTICE O'CONNOR has observed in the constitutional context that "[t]he imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations." *Wygant*, 476 U. S., at 290 (O'CONNOR, J., concurring in part and concurring in judgment).

Contrary to JUSTICE SCALIA's contention, *post*, at 664–668, our decisions last term in *Firefighters, supra,* and *Sheet Metal Workers* v. *EEOC*, 478 U. S. 501 (1986), provide no support for a standard more restrictive than that enunciated in *Weber*. *Firefighters* raised the issue of the conditions under which parties could enter into a consent decree providing for explicit numerical quotas. By contrast, the affirmative action plan in this case sets aside no positions for minorities or women. See *infra*, at 635. In *Sheet Metal Workers*, the issue we addressed was the scope of judicial remedial authority under Title VII, authority that has not been exercised in this case. JUSTICE SCALIA's suggestion that employers should be able to do no more voluntarily than courts can order as remedies, *post*, at 664–668, ignores the fundamental difference between volitional private behavior and the exercise of coercion by the State. Plainly, "Congress' concern that federal courts not impose unwanted obligations on employers and unions," *Firefighters, supra,* at 524, reflects a desire to preserve a relatively large domain for voluntary employer action.

comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise, see *Teamsters* v. *United States*, 431 U. S. 324 (1977) (comparison between percentage of blacks in employer's work force and in general population proper in determining extent of imbalance in truck driving positions), or training programs designed to provide expertise, see *Steelworkers* v. *Weber*, 443 U. S. 193 (1979) (comparison between proportion of blacks working at plant and proportion of blacks in area labor force appropriate in calculating imbalance for purpose of establishing preferential admission to craft training program). Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications. See *Hazelwood School District* v. *United States*, 433 U. S. 299 (1977) (must compare percentage of blacks in employer's work ranks with percentage of qualified black teachers in area labor force in determining underrepresentation in teaching positions). The requirement that the "manifest imbalance" relate to a "traditionally segregated job category" provides assurance both that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefiting from the plan will not be unduly infringed.

A manifest imbalance need not be such that it would support a prima facie case against the employer, as suggested in JUSTICE O'CONNOR's concurrence, *post*, at 649, since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans.[9] Application of the "prima facie" standard in Title VII cases would be inconsistent with *Weber*'s focus on

---

[9] See n. 6, *supra*.

statistical imbalance,[10] and could inappropriately create a significant disincentive for employers to adopt an affirmative action plan. See *Weber, supra,* at 204 (Title VII intended as a "catalyst" for employer efforts to eliminate vestiges of discrimination). A corporation concerned with maximizing return on investment, for instance, is hardly likely to adopt a plan if in order to do so it must compile evidence that could be used to subject it to a colorable Title VII suit.[11]

---

[10] The difference between the "manifest imbalance" and "prima facie" standards is illuminated by *Weber.* Had the Court in that case been concerned with past discrimination by the employer, it would have focused on discrimination in hiring skilled, not unskilled, workers, since only the scarcity of the former in Kaiser's work force would have made it vulnerable to a Title VII suit. In order to make out a prima facie case on such a claim, a plaintiff would be required to compare the percentage of black skilled workers in the Kaiser work force with the percentage of black skilled craft workers in the area labor market.

*Weber* obviously did not make such a comparison. Instead, it focused on the disparity between the percentage of black skilled craft workers in Kaiser's ranks and the percentage of blacks in the area labor force. 443 U. S., at 198–199. Such an approach reflected a recognition that the proportion of black craft workers in the local labor force was likely as miniscule as the proportion in Kaiser's work force. The Court realized that the lack of imbalance between these figures would mean that employers in precisely those industries in which discrimination has been most effective would be precluded from adopting training programs to increase the percentage of qualified minorities. Thus, in cases such as *Weber,* where the employment decision at issue involves the selection of unskilled persons for a training program, the "manifest imbalance" standard permits comparison with the general labor force. By contrast, the "prima facie" standard would require comparison with the percentage of minorities or women qualified for the job for which the trainees are being trained, a standard that would have invalidated the plan in *Weber* itself.

[11] In some cases, of course, the manifest imbalance may be sufficiently egregious to establish a prima facie case. However, as long as there is a manifest imbalance, an employer may adopt a plan even where the disparity is not so striking, without being required to introduce the nonstatistical evidence of past discrimination that would be demanded by the "prima facie" standard. See, *e. g., Teamsters* v. *United States,* 431 U. S. 324, 339 (1977) (statistics in pattern and practice case supplemented by testimony

It is clear that the decision to hire Joyce was made pursuant to an Agency plan that directed that sex or race be taken into account for the purpose of remedying underrepresentation. The Agency Plan acknowledged the "limited opportunities that have existed in the past," App. 57, for women to find employment in certain job classifications "where women have not been traditionally employed in significant numbers." *Id.*, at 51.[12] As a result, observed the Plan, women were concentrated in traditionally female jobs in the Agency, and represented a lower percentage in other job classifications than would be expected if such traditional segregation had not occurred. Specifically, 9 of the 10 Para-Professionals and 110 of the 145 Office and Clerical Workers were women. By contrast, women were only 2 of the 28 Officials and Administrators, 5 of the 58 Professionals, 12 of the 124 Technicians, none of the Skilled Craft Workers, and 1—who was Joyce—of the 110 Road Maintenance Workers. *Id.*, at 51–52. The Plan sought to remedy these imbalances through "hiring, training and promotion of . . . women throughout the Agency in all major job classifications where they are underrepresented." *Id.*, at 43.

---

regarding employment practices). Of course, when there is sufficient evidence to meet the more stringent "prima facie" standard, be it statistical, nonstatistical, or a combination of the two, the employer is free to adopt an affirmative action plan.

[12] For instance, the description of the Skilled Craft Worker category, in which the road dispatcher position is located, is as follows:

"Occupations in which workers perform jobs which require special manual skill and a thorough and comprehensive knowledge of the process involved in the work which is acquired through on-the-job training and experience or through apprenticeship or other formal training programs. Includes: mechanics and repairmen; electricians, heavy equipment operators, stationary engineers, skilled machining occupations, carpenters, compositors and typesetters and kindred workers." App. 108.

As the Court of Appeals said in its decision below, "A plethora of proof is hardly necessary to show that women are generally underrepresented in such positions and that strong social pressures weigh against their participation." 748 F. 2d, at 1313.

As an initial matter, the Agency adopted as a benchmark for measuring progress in eliminating underrepresentation the long-term goal of a work force that mirrored in its major job classifications the percentage of women in the area labor market.[13] Even as it did so, however, the Agency acknowledged that such a figure could not by itself necessarily justify taking into account the sex of applicants for positions in all job categories. For positions requiring specialized training and experience, the Plan observed that the number of minorities and women "who possess the qualifications required for entry into such job classifications is limited." *Id.*, at 56. The Plan therefore directed that annual short-term goals be formulated that would provide a more realistic indication of the degree to which sex should be taken into account in filling particular positions. *Id.*, at 61–64. The Plan stressed that such goals "should not be construed as 'quotas' that must be met," but as reasonable aspirations in correcting the imbalance in the Agency's work force. *Id.*, at 64. These goals were to take into account factors such as "turnover, layoffs, lateral transfers, new job openings, retirements and availability of minorities, women and handicapped persons in the area work force who possess the desired qualifications or potential for placement." *Ibid.* The Plan specifically directed that, in establishing such goals, the Agency work with the County Planning Department and other sources in attempting to compile data on the percentage of minorities and women in the local labor force that were actually working in the job classifications constituting the Agency work force. *Id.*, at 63–64. From the outset, therefore, the Plan sought annually to develop even more refined measures of the underrepresentation in each job category that required attention.

---

[13] Because of the employment decision at issue in this case, our discussion henceforth refers primarily to the Plan's provisions to remedy the underrepresentation of women. Our analysis could apply as well, however, to the provisions of the plan pertaining to minorities.

As the Agency Plan recognized, women were most egregiously underrepresented in the Skilled Craft job category, since *none* of the 238 positions was occupied by a woman. In mid-1980, when Joyce was selected for the road dispatcher position, the Agency was still in the process of refining its short-term goals for Skilled Craft Workers in accordance with the directive of the Plan. This process did not reach fruition until 1982, when the Agency established a short-term goal for that year of 3 women for the 55 expected openings in that job category—a modest goal of about 6% for that category.

We reject petitioner's argument that, since only the long-term goal was in place for Skilled Craft positions at the time of Joyce's promotion, it was inappropriate for the Director to take into account affirmative action considerations in filling the road dispatcher position. The Agency's Plan emphasized that the long-term goals were not to be taken as guides for actual hiring decisions, but that supervisors were to consider a host of practical factors in seeking to meet affirmative action objectives, including the fact that in some job categories women were not qualified in numbers comparable to their representation in the labor force.

By contrast, had the Plan simply calculated imbalances in all categories according to the proportion of women in the area labor pool, and then directed that hiring be governed solely by those figures, its validity fairly could be called into question. This is because analysis of a more specialized labor pool normally is necessary in determining underrepresentation in some positions. If a plan failed to take distinctions in qualifications into account in providing guidance for actual employment decisions, it would dictate mere blind hiring by the numbers, for it would hold supervisors to "achievement of a particular percentage of minority employment or membership . . . regardless of circumstances such as economic conditions or the number of available qualified minority applicants . . . ." *Sheet Metal Workers* v. *EEOC*, 478

U. S. 421, 495 (1986) (O'CONNOR, J., concurring in part and dissenting in part).

The Agency's Plan emphatically did *not* authorize such blind hiring. It expressly directed that numerous factors be taken into account in making hiring decisions, including specifically the qualifications of female applicants for particular jobs. Thus, despite the fact that no precise short-term goal was yet in place for the Skilled Craft category in mid-1980, the Agency's management nevertheless had been clearly instructed that they were not to hire solely by reference to statistics. The fact that only the long-term goal had been established for this category posed no danger that personnel decisions would be made by reflexive adherence to a numerical standard.

Furthermore, in considering the candidates for the road dispatcher position in 1980, the Agency hardly needed to rely on a refined short-term goal to realize that it had a significant problem of underrepresentation that required attention. Given the obvious imbalance in the Skilled Craft category, and given the Agency's commitment to eliminating such imbalances, it was plainly not unreasonable for the Agency to determine that it was appropriate to consider as one factor the sex of Ms. Joyce in making its decision.[14] The promotion of Joyce thus satisfies the first requirement enunciated in *Weber*, since it was undertaken to further an affirmative action plan designed to eliminate Agency work force imbalances in traditionally segregated job categories.

We next consider whether the Agency Plan unnecessarily trammeled the rights of male employees or created an abso-

---

[14] In addition, the Agency was mindful of the importance of finally hiring a woman in a job category that had formerly been all male. The Director testified that, while the promotion of Joyce "made a small dent, for sure, in the numbers," nonetheless "philosophically it made a larger impact in that it probably has encouraged other females and minorities to look at the possibility of so-called 'non-traditional' jobs as areas where they and the agency both have samples of a success story." Tr. 64.

lute bar to their advancement. In contrast to the plan in *Weber*, which provided that 50% of the positions in the craft training program were exclusively for blacks, and to the consent decree upheld last Term in *Firefighters* v. *Cleveland*, 478 U. S. 501 (1986), which required the promotion of specific numbers of minorities, the Plan sets aside no positions for women. The Plan expressly states that "[t]he 'goals' established for each Division should not be construed as 'quotas' that must be met." App. 64. Rather, the Plan merely authorizes that consideration be given to affirmative action concerns when evaluating qualified applicants. As the Agency Director testified, the sex of Joyce was but one of numerous factors he took into acount in arriving at his decision. Tr. 68. The Plan thus resembles the "Harvard Plan" approvingly noted by JUSTICE POWELL in *Regents of University of California* v. *Bakke*, 438 U. S. 265, 316–319 (1978), which considers race along with other criteria in determining admission to the college. As JUSTICE POWELL observed: "In such an admissions program, race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats." *Id.*, at 317. Similarly, the Agency Plan requires women to compete with all other qualified applicants. *No* persons are automatically excluded from consideration; *all* are able to have their qualifications weighed against those of other applicants.

In addition, petitioner had no absolute entitlement to the road dispatcher position. Seven of the applicants were classified as qualified and eligible, and the Agency Director was authorized to promote any of the seven. Thus, denial of the promotion unsettled no legitimate, firmly rooted expectation on the part of petitioner. Furthermore, while petitioner in this case was denied a promotion, he retained his employment with the Agency, at the same salary and with the same seniority, and remained eligible for other promotions.[15]

---

[15] Furthermore, from 1978 to 1982 Skilled Craft jobs in the Agency increased from 238 to 349. The Agency's personnel figures indicate that the

Finally, the Agency's Plan was intended to *attain* a balanced work force, not to maintain one. The Plan contains 10 references to the Agency's desire to "attain" such a balance, but no reference whatsoever to a goal of maintaining it. The Director testified that, while the "broader goal" of affirmative action, defined as "the desire to hire, to promote, to give opportunity and training on an equitable, non-discriminatory basis," is something that is "a permanent part" of "the Agency's operating philosophy," that broader goal "is divorced, if you will, from specific numbers or percentages." Tr. 48–49.

The Agency acknowledged the difficulties that it would confront in remedying the imbalance in its work force, and it anticipated only gradual increases in the representation of minorities and women.[16] It is thus unsurprising that the Plan contains no explicit end date, for the Agency's flexible, case-by-case approach was not expected to yield success in a brief period of time. Express assurance that a program is

---

Agency fully expected most of these positions to be filled by men. Of the 111 new Skilled Craft jobs during this period, 105, or almost 95%, went to men. As previously noted, the Agency's 1982 Plan set a goal of hiring only 3 women out of the 55 new Skilled Craft positions projected for that year, a figure of about 6%. While this degree of employment expansion by an employer is by no means essential to a plan's validity, it underscores the fact that the Plan in this case in no way significantly restricts the employment prospects of such persons. Illustrative of this is the fact that an additional road dispatcher position was created in 1983, and petitioner was awarded the job. Brief for Respondent Transportation Agency 36, n. 35.

[16] As the Agency Plan stated, after noting the limited number of minorities and women qualified in certain categories, as well as other difficulties in remedying underrepresentation:

"As indicated by the above factors, it will be much easier to attain the Agency's employment goals in some job categories than in others. It is particularly evident that it will be extremely difficult to significantly increase the representation of women in technical and skilled craft job classifications where they have traditionally been greatly underrepresented. Similarly, only gradual increases in the representation of women, minorities or handicapped persons in management and professional positions can realistically be expected due to the low turnover that exists in these positions and the small numbers of persons who can be expected to compete for available openings." App. 58.

only temporary may be necessary if the program actually sets aside positions according to specific numbers. See, *e. g., Firefighters, supra,* at 510 (4-year duration for consent decree providing for promotion of particular number of minorities); *Weber,* 443 U. S., at 199 (plan requiring that blacks constitute 50% of new trainees in effect until percentage of employer work force equal to percentage in local labor force). This is necessary both to minimize the effect of the program on other employees, and to ensure that the plan's goals "[are] not being used simply to achieve and maintain . . . balance, but rather as a benchmark against which" the employer may measure its progress in eliminating the underrepresentation of minorities and women. *Sheet Metal Workers,* 478 U. S., at 477–478. In this case, however, substantial evidence shows that the Agency has sought to take a moderate, gradual approach to eliminating the imbalance in its work force, one which establishes realistic guidance for employment decisions, and which visits minimal intrusion on the legitimate expectations of other employees. Given this fact, as well as the Agency's express commitment to "attain" a balanced work force, there is ample assurance that the Agency does not seek to use its Plan to maintain a permanent racial and sexual balance.

## III

In evaluating the compliance of an affirmative action plan with Title VII's prohibition on discrimination, we must be mindful of "this Court's and Congress' consistent emphasis on 'the value of voluntary efforts to further the objectives of the law.'" *Wygant,* 476 U. S., at 290 (O'CONNOR, J., concurring in part and concurring in judgment) (quoting *Bakke, supra,* at 364). The Agency in the case before us has undertaken such a voluntary effort, and has done so in full recognition of both the difficulties and the potential for intrusion on males and nonminorities. The Agency has identified a conspicuous imbalance in job categories traditionally segregated by race and sex. It has made clear from the outset, how-

ever, that employment decisions may not be justified solely by reference to this imbalance, but must rest on a multitude of practical, realistic factors. It has therefore committed itself to annual adjustment of goals so as to provide a reasonable guide for actual hiring and promotion decisions. The Agency earmarks no positions for anyone; sex is but one of several factors that may be taken into account in evaluating qualified applicants for a position.[17] As both the Plan's language and its manner of operation attest, the Agency has no intention of establishing a work force whose permanent composition is dictated by rigid numerical standards.

We therefore hold that the Agency appropriately took into account as one factor the sex of Diane Joyce in determining

---

[17] JUSTICE SCALIA's dissent predicts that today's decision will loose a flood of "less qualified" minorities and women upon the work force, as employers seek to forestall possible Title VII liability. Post, at 673–677. The first problem with this projection is that it is by no means certain that employers could in every case necessarily avoid liability for discrimination merely by adopting an affirmative action plan. Indeed, our unwillingness to require an admission of discrimination as the price of adopting a plan has been premised on concern that the potential liability to which such an admission would expose an employer would serve as a disincentive for creating an affirmative action program. See n. 8, supra.

A second, and more fundamental, problem with JUSTICE SCALIA's speculation is that he ignores the fact that

"[i]t is a standard tenet of personnel administration that there is rarely a single, 'best qualified' person for a job. An effective personnel system will bring before the selecting official several fully-qualified candidates who each may possess different attributes which recommend them for selection. Especially where the job is an unexceptional, middle-level craft position, without the need for unique work experience or educational attainment and for which several well-qualified candidates are available, final determinations as to which candidate is 'best qualified' are at best subjective." Brief for the American Society for Personnel Administration as Amicus Curiae 9.

This case provides an example of precisely this point. Any differences in qualifications between Johnson and Joyce were minimal, to say the least. See supra, at 623–625. The selection of Joyce thus belies JUSTICE SCALIA's contention that the beneficiaries of affirmative action programs will be those employees who are merely not "utterly unqualified." Post, at 675.

that she should be promoted to the road dispatcher position. The decision to do so was made pursuant to an affirmative action plan that represents a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women in the Agency's work force. Such a plan is fully consistent with Title VII, for it embodies the contribution that voluntary employer action can make in eliminating the vestiges of discrimination in the workplace. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring.

While I join the Court's opinion, I write separately to explain my view of this case's position in our evolving antidiscrimination law and to emphasize that the opinion does not establish the permissible outer limits of voluntary programs undertaken by employers to benefit disadvantaged groups.

I

Antidiscrimination measures may benefit protected groups in two distinct ways. As a sword, such measures may confer benefits by specifying that a person's membership in a disadvantaged group must be a neutral, irrelevant factor in governmental or private decisionmaking or, alternatively, by compelling decisionmakers to give favorable consideration to disadvantaged group status. As a shield, an antidiscrimination statute can also help a member of a protected class by assuring decisionmakers in some instances that, when they elect for good reasons of their own to grant a preference of some sort to a minority citizen, they will not violate the law. The Court properly holds that the statutory shield allowed respondent to take Diane Joyce's sex into account in promoting her to the road dispatcher position.

Prior to 1978 the Court construed the Civil Rights Act of 1964 as an absolute blanket prohibition against discrimination which neither required nor permitted discriminatory prefer-

ences for any group, minority or majority. The Court unambiguously endorsed the neutral approach, first in the context of gender discrimination[1] and then in the context of racial discrimination against a white person.[2] As I explained in my separate opinion in *Regents of University of California* v. *Bakke*, 438 U. S. 265, 412–418 (1978), and as the Court forcefully stated in *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 280 (1976), Congress intended "'to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians'" (citations omitted). If the Court had adhered to that construction of the Act, petitioner would unquestionably prevail in this case. But it has not done so.

---

[1] "Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971).

[2] "Similarly the EEOC, whose interpretations are entitled to great deference, [401 U. S.,] at 433–434, has consistently interpreted Title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would

"'constitute a derogation of the Commission's Congressional mandate to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians.' EEOC Decision No. 74–31, 7 FEP Cases 1326, 1328, CCH EEOC Decisions ¶ 6404, p. 4084 (1973).

"This conclusion is in accord with uncontradicted legislative history to the effect that Title VII was intended to 'cover white men and white women and all Americans,' 110 Cong. Rec. 2578 (1964) (remarks of Rep. Celler), and create an 'obligation not to discriminate against whites,' *id.*, at 7218 (memorandum of Sen. Clark). See also *id.*, at 7213 (memorandum of Sens. Clark and Case); *id.*, at 8912 (remarks of Sen. Williams). We therefore hold today that Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes and Jackson white." *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 279–280 (1976) (footnotes omitted).

In the *Bakke* case in 1978 and again in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), a majority of the Court interpreted the antidiscriminatory strategy of the statute in a fundamentally different way. The Court held in the *Weber* case that an employer's program designed to increase the number of black craftworkers in an aluminum plant did not violate Title VII.[3] It remains clear that the Act does not *require* any employer to grant preferential treatment on the basis of race or gender, but since 1978 the Court has unambiguously interpreted the statute to *permit* the voluntary adoption of special programs to benefit members of the minority groups for whose protection the statute was enacted. Neither the "same standards" language used in *McDonald*, nor the "color blind" rhetoric used by the Senators and Congressmen who enacted the bill, is now controlling. Thus, as was true in *Runyon* v. *McCrary*, 427 U. S. 160, 189 (1976) (STEVENS, J., concurring), the only problem for me is whether to adhere to an authoritative construction of the Act that is at odds with my understanding of the actual intent of the authors of the legislation. I conclude without hesitation that I must answer that question in the affirmative, just as I did in *Runyon*. *Id.*, at 191–192.

*Bakke* and *Weber* have been decided and are now an important part of the fabric of our law. This consideration is sufficiently compelling for me to adhere to the basic construction of this legislation that the Court adopted in *Bakke* and in *Weber*. There is an undoubted public interest in "stability and orderly development of the law." 427 U. S., at 190.[4]

---

[3] Toward the end of its opinion, the Court mentioned certain reasons why the plan did not impose a special hardship on white employees or white applicants for employment. *Steelworkers* v. *Weber*, 443 U. S., at 208. I have never understood those comments to constitute a set of conditions that every race-conscious plan must satisfy in order to comply with Title VII.

[4] "As Mr. Justice Cardozo remarked, with respect to the routine work of the judiciary: 'The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the

The logic of antidiscrimination legislation requires that judicial constructions of Title VII leave "breathing room" for employer initiatives to benefit members of minority groups. If Title VII had never been enacted, a private employer would be free to hire members of minority groups for any reason that might seem sensible from a business or a social point of view. The Court's opinion in *Weber* reflects the same approach; the opinion relied heavily on legislative history indicating that Congress intended that traditional management prerogatives be left undisturbed to the greatest extent possible. See 443 U. S., at 206–207. As we observed last Term, " '[i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long" constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.' " *Firefighters* v. *Cleveland*, 478 U. S. 501, 516 (1986) (quoting *Weber*, 443 U. S., at 204). In *Firefighters*, we again acknowledged Congress' concern in Title VII to avoid "undue federal interference with managerial discretion." 478 U. S., at 519.[5]

---

courses laid by others who had gone before him.' Turning to the exceptional case, Mr. Justice Cardozo noted: '[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.' In this case, those admonitions favor adherence to, rather than departure from, precedent." 427 U. S., at 190–191. Even while writing in dissent in the *Weber* case, Chief Justice Burger observed that the result reached by the majority was one that he "would be inclined to vote for were I a Member of Congress considering a proposed amendment of Title VII." 443 U. S., at 216.

[5] As JUSTICE BLACKMUN observed in *Weber*, 443 U. S., at 209, 214–215 (concurring opinion):

"Strong considerations of equity support an interpretation of Title VII that would permit private affirmative action to reach where Title VII itself

As construed in *Weber* and in *Firefighters*, the statute does not absolutely prohibit preferential hiring in favor of minorities; it was merely intended to protect historically disadvantaged groups *against* discrimination and not to hamper managerial efforts to benefit members of disadvantaged groups that are consistent with that paramount purpose. The preference granted by respondent in this case does not violate the statute as so construed; the record amply supports the conclusion that the challenged employment decision served the legitimate purpose of creating diversity in a category of employment that had been almost an exclusive province of males in the past. Respondent's voluntary decision is surely not prohibited by Title VII as construed in *Weber*.

## II

Whether a voluntary decision of the kind made by respondent would ever be prohibited by Title VII is a question we need not answer until it is squarely presented. Given the interpretation of the statute the Court adopted in *Weber*, I see no reason why the employer has any duty, prior to granting a preference to a qualified minority employee, to determine whether his past conduct might constitute an arguable violation of Title VII. Indeed, in some instances the employer may find it more helpful to focus on the future. Instead of retroactively scrutinizing his own or society's possible exclusions of minorities in the past to determine the outer limits of a valid affirmative-action program—or indeed, any particular affirmative-action decision—in many cases the employer will find it more appropriate to consider other legitimate reasons to give preferences to members of underrepresented groups.

---

does not. The bargain struck in 1964 with the passage of Title VII guaranteed equal opportunity for white and black alike, but where Title VII provides no remedy for blacks, it should not be construed to foreclose private affirmative action from supplying relief. . . . Absent compelling evidence of legislative intent, I would not interpret Title VII itself as a means of 'locking in' the effects of discrimination for which Title VII provides no remedy."

Statutes enacted for the benefit of minority groups should not block these forward-looking considerations.

> "Public and private employers might choose to implement affirmative action for many reasons other than to purge their own past sins of discrimination. The Jackson school board, for example, said it had done so in part to improve the quality of education in Jackson—whether by improving black students' performance or by dispelling for black and white students alike any idea that white supremacy governs our social institutions. Other employers might advance different forward-looking reasons for affirmative action: improving their services to black constituencies, averting racial tension over the allocation of jobs in a community, or increasing the diversity of a work force, to name but a few examples. Or they might adopt affirmative action simply to eliminate from their operations all de facto embodiment of a system of racial caste. All of these reasons aspire to a racially integrated future, but none reduces to 'racial balancing for its own sake.'" Sullivan, The Supreme Court—Comment, Sins of Discrimination: Last Term's Affirmative Action Cases, 100 Harv. L. Rev. 78, 96 (1986).

The Court today does not foreclose other voluntary decisions based in part on a qualified employee's membership in a disadvantaged group. Accordingly, I concur.

JUSTICE O'CONNOR, concurring in the judgment.

In *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), this Court held that § 703(d) of Title VII does not prohibit voluntary affirmative action efforts if the employer sought to remedy a "manifest . . . imbalanc[e] in traditionally segregated job categories." *Id.*, at 197. As JUSTICE SCALIA illuminates with excruciating clarity, § 703 has been interpreted by *Weber* and succeeding cases to permit what its language read literally would prohibit. *Post*, at 669–671; see also *ante*, at 642–643

(STEVENS, J., concurring). Section 703(d) prohibits employment discrimination "against *any individual* because of his race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(d) (emphasis added). The *Weber* Court, however, concluded that voluntary affirmative action was permissible in some circumstances because a prohibition of every type of affirmative action would "'bring about an end completely at variance with the purpose of the statute.'" 443 U. S., at 202 (quoting *United States* v. *Public Utilities Comm'n,* 345 U. S. 295, 315 (1953)). This purpose, according to the Court, was to open employment opportunities for blacks in occupations that had been traditionally closed to them.

None of the parties in this case have suggested that we overrule *Weber* and that question was not raised, briefed, or argued in this Court or in the courts below. If the Court is faithful to its normal prudential restraints and to the principle of *stare decisis* we must address once again the propriety of an affirmative action plan under Title VII in light of our precedents, precedents that have upheld affirmative action in a variety of circumstances. This time the question posed is whether a public employer violates Title VII by promoting a qualified woman rather than a marginally better qualified man when there is a statistical imbalance sufficient to support a claim of a pattern or practice of discrimination against women under Title VII.

I concur in the judgment of the Court in light of our precedents. I write separately, however, because the Court has chosen to follow an expansive and ill-defined approach to voluntary affirmative action by public employers despite the limitations imposed by the Constitution and by the provisions of Title VII, and because JUSTICE SCALIA's dissent rejects the Court's precedents and addresses the question of how Title VII should be interpreted as if the Court were writing on a clean slate. The former course of action gives insufficient guidance to courts and litigants; the latter course of action serves as a useful point of academic discussion, but fails

to reckon with the reality of the course that the majority of the Court has determined to follow.

In my view, the proper initial inquiry in evaluating the legality of an affirmative action plan by a public employer under Title VII is no different from that required by the Equal Protection Clause. In either case, consistent with the congressional intent to provide some measure of protection to the interests of the employer's nonminority employees, the employer must have had a firm basis for believing that remedial action was required. An employer would have such a firm basis if it can point to a statistical disparity sufficient to support a prima facie claim under Title VII by the employee beneficiaries of the affirmative action plan of a pattern or practice claim of discrimination.

In *Weber*, this Court balanced two conflicting concerns in construing § 703(d): Congress' intent to root out invidious discrimination against *any* person on the basis of race or gender, *McDonald* v. *Santa Fe Transportation Co.*, 427 U. S. 273 (1976), and its goal of eliminating the lasting effects of discrimination against minorities. Given these conflicting concerns, the Court concluded that it would be inconsistent with the background and purpose of Title VII to prohibit affirmative action in all cases. As I read *Weber*, however, the Court also determined that Congress had balanced these two competing concerns by permitting affirmative action only as a remedial device to eliminate actual or apparent discrimination or the lingering effects of this discrimination.

Contrary to the intimations in JUSTICE STEVENS' concurrence, this Court did not approve preferences for minorities "for any reason that might seem sensible from a business or a social point of view." *Ante*, at 645. Indeed, such an approach would have been wholly at odds with this Court's holding in *McDonald* that Congress intended to prohibit practices that operate to discriminate against the employment opportunities of nonminorities as well as minorities. Moreover, in *Weber* the Court was careful to consider the effects of the af-

firmative action plan for black employees on the employment opportunities of white employees. 443 U. S., at 208. Instead of a wholly standardless approach to affirmative action, the Court determined in *Weber* that Congress intended to permit affirmative action only if the employer could point to a "manifest . . . imbalanc[e] in traditionally segregated job categories." *Id.*, at 197. This requirement both "provides assurance . . . that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination," *ante*, at 632, and is consistent with this Court's and Congress' consistent emphasis on the value of voluntary efforts to further the antidiscrimination purposes of Title VII. *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 290 (1986) (O'CONNOR, J., concurring in part and concurring in judgment).

The *Weber* view of Congress' resolution of the conflicting concerns of minority and nonminority workers in Title VII appears substantially similar to this Court's resolution of these same concerns in *Wygant* v. *Jackson Board of Education, supra*, which involved the claim that an affirmative action plan by a public employer violated the Equal Protection Clause. In *Wygant*, the Court was in agreement that remedying past or present racial discrimination by a state actor is a sufficiently weighty interest to warrant the remedial use of a carefully constructed affirmative action plan. The Court also concluded, however, that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Id.*, at 276. Instead, we determined that affirmative action was valid if it was crafted to remedy past or present discrimination by the employer. Although the employer need not point to any contemporaneous findings of actual discrimination, I concluded in *Wygant* that the employer must point to evidence sufficient to establish a firm basis for believing that remedial action is required, and that a statistical imbalance sufficient for a Title VII prima facie

case against the employer would satisfy this firm basis requirement:

"Public employers are not without reliable benchmarks in making this determination. For example, demonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent authority such as the School Board to conclude that implementation of a voluntary affirmative action plan is appropriate to remedy apparent prior employment discrimination." *Id.*, at 292.

The *Wygant* analysis is entirely consistent with *Weber*. In *Weber*, the affirmative action plan involved a training program for unskilled production workers. There was little doubt that the absence of black craftworkers was the result of the exclusion of blacks from craft unions. *Steelworkers* v. *Weber*, 443 U. S., at 198, n. 1 ("Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice"). The employer in *Weber* had previously hired as craftworkers only persons with prior craft experience, and craft unions provided the sole avenue for obtaining this experience. Because the discrimination occurred at entry into the craft union, the "manifest racial imbalance" was powerful evidence of prior race discrimination. Under our case law, the relevant comparison for a Title VII prima facie case in those circumstances—discrimination in admission to entry-level positions such as membership in craft unions—is to the total percentage of blacks in the labor force. See *Teamsters* v. *United States*, 431 U. S. 324 (1977); cf. *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 437–439 (1986) (observing that lower courts had relied on comparison to general labor force in finding Title VII violation by union). Here, however, the evidence of past discrimination is more complex. The num-

ber of women with the qualifications for entry into the relevant job classification was quite small. A statistical imbalance between the percentage of women in the work force generally and the percentage of women in the particular specialized job classification, therefore, does not suggest past discrimination for purposes of proving a Title VII prima facie case. See *Hazelwood School District* v. *United States*, 433 U. S. 299, 308, and n. 13 (1977).

Unfortunately, the Court today gives little guidance for what statistical imbalance is sufficient to support an affirmative action plan. Although the Court denies that the statistical imbalance need be sufficient to make out a prima facie case of discrimination against women, *ante*, at 632, the Court fails to suggest an alternative standard. Because both *Wygant* and *Weber* attempt to reconcile the same competing concerns, I see little justification for the adoption of different standards for affirmative action under Title VII and the Equal Protection Clause.

While employers must have a firm basis for concluding that remedial action is necessary, neither *Wygant* nor *Weber* places a burden on employers to prove that they actually discriminated against women or minorities. Employers are "trapped between the competing hazards of liability to minorities if affirmative action is *not* taken to remedy apparent employment discrimination and liability to nonminorities if affirmative action *is* taken." *Wygant* v. *Jackson Board of Education*, 476 U. S., at 291 (O'CONNOR, J., concurring in part and concurring in judgment). Moreover, this Court has long emphasized the importance of voluntary efforts to eliminate discrimination. *Id.*, at 290. Thus, I concluded in *Wygant* that a contemporaneous finding of discrimination should not be required because it would discourage voluntary efforts to remedy apparent discrimination. A requirement that an employer actually prove that it had discriminated in the past would also unduly discourage voluntary efforts to remedy apparent discrimination. As I emphasized in *Wygant*, a chal-

lenge to an affirmative action plan "does not automatically impose upon the public employer the burden of convincing the court of its liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based on the employer's proof before the employer's affirmative action plan will be upheld." *Id.*, at 292. Evidence sufficient for a prima facie Title VII pattern or practice claim against the employer itself suggests that the absence of women or minorities in a work force cannot be explained by general societal discrimination alone and that remedial action is appropriate.

In applying these principles to this case, it is important to pay close attention to both the affirmative action plan, and the manner in which that plan was applied to the specific promotion decision at issue in this case. In December 1978, the Santa Clara Transit District Board of Supervisors adopted an affirmative action plan for the Santa Clara County Transportation Agency (Agency). At the time the plan was adopted, not one woman was employed in respondents' 238 skilled craft positions, and the plan recognized that women "are not strongly motivated to seek employment in job classifications where they have not been traditionally employed because of the limited opportunities that have existed in the past for them to work in such classifications." App. 57. Additionally, the plan stated that respondents "recognize[d] that mere prohibition of discriminatory practices is not enough to remedy the effects of past practices and to permit attainment of an equitable representation of minorities, women and handicapped persons," *id.*, at 31, and that "the selection and appointment processes are areas where hidden discrimination frequently occurs." *Id.*, at 71. Thus, respondents had the expectation that the plan "should result in improved personnel practices that will benefit all Agency employees who may have been subjected to discriminatory personnel practices in the past." *Id.*, at 35.

The long-term goal of the plan was "to attain a work force whose composition in all job levels and major job classifications approximates the distribution of women . . . in the Santa Clara County work force." *Id.*, at 54. If this long-term goal had been applied to the hiring decisions made by the Agency, in my view, the affirmative action plan would violate Title VII. "[I]t is completely unrealistic to assume that individuals of each [sex] will gravitate with mathematical exactitude to each employer . . . absent unlawful discrimination." *Sheet Metal Workers*, 478 U. S., at 494 (O'CONNOR, J., concurring in part and dissenting in part). Thus, a goal that makes such an assumption, and simplistically focuses on the proportion of women and minorities in the work force without more, is not remedial. Only a goal that takes into account the number of women and minorities qualified for the relevant position could satisfy the requirement that an affirmative action plan be remedial. This long-range goal, however, was never used as a guide for actual hiring decisions. Instead, the goal was merely a statement of aspiration wholly without operational significance. The affirmative action plan itself recognized the host of reasons why this goal was extremely unrealistic, App. 56–57, and as I read the record, the long-term goal was not applied in the promotion decision challenged in this case. Instead, the plan provided for the development of short-term goals, which alone were to guide respondents, *id.*, at 61, and the plan cautioned that even these goals "should not be construed as 'quotas' that must be met." *Id.*, at 64. Instead, these short-term goals were to be focused on remedying past apparent discrimination, and would "[p]rovide an objective standard for use in determining if the representation of minorities, women and handicapped persons in particular job classifications is at a reasonable level in comparison with estimates of the numbers of persons from these groups in the area work force who can meet the educational and experience requirements for employment." *Id.*, at 61.

At the time of the promotion at issue in this case, the short-term goals had not been fully developed. Nevertheless, the Agency had already recognized that the long-range goal was unrealistic, and had determined that the progress of the Agency should be judged by a comparison to the *qualified* women in the area work force. As I view the record, the promotion decision in this case was entirely consistent with the philosophy underlying the development of the short-term goals.

The Agency announced a vacancy for the position of road dispatcher in the Agency's Roads Division on December 12, 1979. Twelve employees applied for this position, including Diane Joyce and petitioner. Nine of these employees were interviewed for the position by a two-person board. Seven applicants—including Joyce and petitioner—scored above 70 on this interview, and were certified as eligible for selection for the promotion. Petitioner scored 75 on the interview, while Joyce scored 73. After a second interview, a committee of three agency employees recommended that petitioner be selected for the promotion to road dispatcher. The County's Affirmative Action Officer, on the other hand, urged that Joyce be selected for the position.

The ultimate decision to promote Joyce rather than petitioner was made by James Graebner, the Director of the Agency. As JUSTICE SCALIA views the record in this case, the Agency Director made the decision to promote Joyce rather than petitioner solely on the basis of sex and with indifference to the relative merits of the two applicants. See *post*, at 662–663. In my view, however, the record simply fails to substantiate the picture painted by JUSTICE SCALIA. The Agency Director testified that he "tried to look at the whole picture, the combination of [Joyce's] qualifications and Mr. Johnson's qualifications, their test scores, their experience, their background, affirmative action matters, things like that." Tr. 68. Contrary to JUSTICE SCALIA's suggestion, *post*, at 663, the Agency Director knew far more than

merely the sex of the candidates and that they appeared on a list of candidates eligible for the job. The Director had spoken to individuals familiar with the qualifications of both applicants for the promotion, and was aware that their scores were rather close. Moreover, he testified that over a period of weeks he had spent several hours making the promotion decision, suggesting that Joyce was not selected solely on the basis of her sex. Tr. 63. Additionally, the Director stated that had Joyce's experience been less than that of petitioner by a larger margin, petitioner might have received the promotion. *Id.*, at 69–70. As the Director summarized his decision to promote Joyce, the underrepresentation of women in skilled craft positions was only one element of a number of considerations that led to the promotion of Ms. Joyce. *Ibid.* While I agree with JUSTICE SCALIA's dissent that an affirmative action program that automatically and blindly promotes those marginally qualified candidates falling within a preferred race or gender category, or that can be equated with a permanent plan of "proportionate representation by race and sex," would violate Title VII, I cannot agree that this is such a case. Rather, as the Court demonstrates, Joyce's sex was simply used as a "plus" factor. *Ante*, at 636–637.

In this case, I am also satisfied that respondents had a firm basis for adopting an affirmative action program. Although the District Court found no discrimination against women in fact, at the time the affirmative action plan was adopted, there were *no* women in its skilled craft positions. Petitioner concedes that women constituted approximately 5% of the local labor pool of skilled craft workers in 1970. Reply Brief for Petitioner 9. Thus, when compared to the percentage of women in the qualified work force, the statistical disparity would have been sufficient for a prima facie Title VII case brought by unsuccessful women job applicants. See *Teamsters*, 431 U. S., at 342, n. 23 ("[F]ine tuning of the statistics could not have obscured the glaring absence of minority line drivers. . . . [T]he company's inability to rebut the in-

ference of discrimination came not from a misuse of statistics but from 'the inexorable zero'").

In sum, I agree that respondents' affirmative action plan as implemented in this instance with respect to skilled craft positions satisfies the requirements of *Weber* and of *Wygant*. Accordingly, I concur in the judgment of the Court.

JUSTICE WHITE, dissenting.

I agree with Parts I and II of JUSTICE SCALIA's dissenting opinion. Although I do not join Part III, I also would overrule *Weber*. My understanding of *Weber* was, and is, that the employer's plan did not violate Title VII because it was designed to remedy the intentional and systematic exclusion of blacks by the employer and the unions from certain job categories. That is how I understood the phrase "traditionally segregated jobs" that we used in that case. The Court now interprets it to mean nothing more than a manifest imbalance between one identifiable group and another in an employer's labor force. As so interpreted, that case, as well as today's decision, as JUSTICE SCALIA so well demonstrates, is a perversion of Title VII. I would overrule *Weber* and reverse the judgment below.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, and with whom JUSTICE WHITE joins in Parts I and II, dissenting.

With a clarity which, had it not proven so unavailing, one might well recommend as a model of statutory draftsmanship, Title VII of the Civil Rights Act of 1964 declares:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a).

The Court today completes the process of converting this from a guarantee that race or sex will *not* be the basis for employment determinations, to a guarantee that it often *will.* Ever so subtly, without even alluding to the last obstacles preserved by earlier opinions that we now push out of our path, we effectively replace the goal of a discrimination-free society with the quite incompatible goal of proportionate representation by race and by sex in the workplace. Part I of this dissent will describe the nature of the plan that the Court approves, and its effect upon this petitioner. Part II will discuss prior holdings that are tacitly overruled, and prior distinctions that are disregarded. Part III will describe the engine of discrimination we have finally completed.

I

On October 16, 1979, the County of Santa Clara adopted an Affirmative Action Program (County plan) which sought the "attainment of a County work force whose composition . . . includes women, disabled persons and ethnic minorities in a ratio in all job categories that reflects their distribution in the Santa Clara County area work force." App. 113. In order to comply with the County plan and various requirements imposed by federal and state agencies, the Transportation Agency adopted, effective December 18, 1978, the Equal Employment Opportunity Affirmative Action Plan (Agency plan or plan) at issue here. Its stated long-range goal was the same as the County plan's: "to attain a work force whose composition in all job levels and major job classifications approximates the distribution of women, minority and handicapped persons in the Santa Clara County work force." *Id.,*

at 54. The plan called for the establishment of a procedure by which Division Directors would review the ethnic and sexual composition of their work forces whenever they sought to fill a vacancy, which procedure was expected to include "a requirement that Division Directors indicate why they did *not* select minorities, women and handicapped persons if such persons were on the list of eligibles considered and if the Division had an underrepresentation of such persons in the job classification being filled." *Id.*, at 75 (emphasis in original).

Several salient features of the plan should be noted. Most importantly, the plan's purpose was assuredly not to remedy prior sex discrimination by the Agency. It could not have been, because there was no prior sex discrimination to remedy. The majority, in cataloging the Agency's alleged misdeeds, *ante*, at 624, n. 5, neglects to mention the District Court's finding that the Agency "has not discriminated in the past, and does not discriminate in the present against women in regard to employment opportunities in general and promotions in particular." App. to Pet. for Cert. 13a. This finding was not disturbed by the Ninth Circuit.

Not only was the plan not directed at the results of past sex discrimination by the Agency, but its objective was not to achieve the state of affairs that this Court has dubiously assumed would result from an absence of discrimination—an overall work force "more or less representative of the racial and ethnic composition of the population in the community." *Teamsters* v. *United States*, 431 U. S. 324, 340, n. 20 (1977). Rather, the oft-stated goal was to mirror the racial and sexual composition of the entire county labor force, not merely in the Agency work force as a whole, but in each and every individual job category at the Agency. In a discrimination-free world, it would obviously be a statistical oddity for every job category to match the racial and sexual composition of even that portion of the county work force *qualified* for that job; it would be utterly miraculous for each of them to match, as the plan expected, the composition of the *entire* work force.

Quite obviously, the plan did not seek to replicate what a lack of discrimination would produce, but rather imposed racial and sexual tailoring that would, in defiance of normal expectations and laws of probability, give each protected racial and sexual group a governmentally determined "proper" proportion of each job category.

That the plan was not directed at remedying or eliminating the effects of past discrimination is most clearly illustrated by its description of what it regarded as the *"Factors Hindering Goal Attainment"*—*i. e.*, the existing impediments to the racially and sexually representative work force that it pursued. The plan noted that it would be "difficult," App. 55, to attain its objective of across-the-board statistical parity in at least some job categories, because:

"a. Most of the positions require specialized training and experience. Until recently, relatively few minorities, women and handicapped persons sought entry into these positions. Consequently, the number of persons from these groups in the area labor force who possess the qualifications required for entry into such job classifications is limited.

.      .      .      .      .

"c. Many of the Agency positions where women are underrepresented involve heavy labor; e. g., Road Maintenance Worker. Consequently, few women seek entry into these positions.

.      .      .      .      .

"f. Many women are not strongly motivated to seek employment in job classifications where they have not been traditionally employed because of the limited opportunities that have existed in the past for them to work in such classifications." *Id.*, at 56–57.

That is, the qualifications and desires of women may fail to match the Agency's Platonic ideal of a work force. The plan concluded from this, of course, not that the ideal should be reconsidered, but that its attainment could not be immediate.

*Id.*, at 58–60. It would, in any event, be rigorously pursued, by giving "special consideration to Affirmative Action requirements in every individual hiring action pertaining to positions where minorities, women and handicapped persons continue to be underrepresented." *Id.*, at 60.[1]

Finally, the one message that the plan unmistakably communicated was that concrete results were expected, and supervisory personnel would be evaluated on the basis of the affirmative-action numbers they produced. The plan's implementation was expected to "result in a statistically measurable yearly improvement in the hiring, training and promotion of minorities, women and handicapped persons in the major job classifications utilized by the Agency where these groups are underrepresented." *Id.*, at 35. Its Preface declared that "[t]he degree to which each Agency Division *attains the Plan's objectives* will provide a direct measure of that Division Director's personal commitment to the EEO Policy," *ibid.* (emphasis added), and the plan itself repeated that "[t]he degree to which each Division *attains the Agency Affirmative Action employment goals* will provide a measure of that Director's commitment and effectiveness in carrying out the Division's EEO Affirmative Action requirements." *Id.*, at 44 (emphasis added). As noted earlier, supervisors were reminded of the need to give attention to affirmative action in every employment decision, and to explain their reasons for *failing* to hire women and minorities whenever there was an opportunity to do so.

The petitioner in the present case, Paul E. Johnson, had been an employee of the Agency since 1967, coming there from a private company where he had been a road dispatcher for 17 years. He had first applied for the position of Road Dispatcher at the Agency in 1974, coming in second. Sev-

---

[1] This renders utterly incomprehensible the majority's assertion that "the Agency acknowledged that [its long-term goal] could not by itself necessarily justify taking into account the sex of applicants for positions in all job categories." *Ante*, at 635.

eral years later, after a reorganization resulted in a downgrading of his Road Yard Clerk II position, in which Johnson "could see no future," Tr. 127, he requested and received a voluntary demotion from Road Yard Clerk II to Road Maintenance Worker, to increase his experience and thus improve his chances for future promotion. When the Road Dispatcher job next became vacant, in 1979, he was the leading candidate—and indeed was assigned to work out of class full time in the vacancy, from September 1979 until June 1980. There is no question why he did not get the job.

The fact of discrimination against Johnson is much clearer, and its degree more shocking, than the majority and JUSTICE O'CONNOR's concurrence would suggest—largely because neither of them recites a single one of the District Court findings that govern this appeal, relying instead upon portions of the transcript which those findings implicitly rejected, and even upon a document (favorably comparing Joyce to Johnson), *ante*, at 625, that was prepared *after* Joyce was selected. See App. 27–28; Tr. 223–227. Worth mentioning, for example, is the trier of fact's determination that, if the Affirmative Action Coordinator had not intervened, "the decision as to whom to promote . . . would have been made by [the Road Operations Division Director]," App. to Pet. for Cert. 12a, who had recommended that Johnson be appointed to the position. *Ibid.*[2] Likewise, the even more extraordi-

---

[2] The character of this intervention, and the reasoning behind it, was described by the Agency Director in his testimony at trial:

"Q. How did you happen to become involved in this particular promotional opportunity?

"A. I . . . became aware that there was a difference of opinion between specifically the Road Operations people [Mr. Shields] and the Affirmative Action Director [Mr. Morton] as to the desirability of certain of the individuals to be promoted.

.    .    .    .    .

". . . Mr. Shields felt that Mr. Johnson should be appointed to that position.

"Q. Mr. Morton felt that Diane Joyce should be appointed?

nary findings that James Graebner, the Agency Director who made the appointment, "did not inspect the applications and related examination records of either [Paul Johnson] or Diane Joyce before making his decision," *ibid.*, and indeed "did little or nothing to inquire into the results of the interview process and conclusions which [were] described as of critical importance to the selection process." *Id.*, at 3a. In light of these determinations, it is impossible to believe (or to think that the District Court believed) Graebner's self-serving statements relied upon by the majority and JUSTICE O'CONNOR's concurrence, such as the assertion that he "tried to look at the whole picture, the combination of [Joyce's] qualifications and Mr. Johnson's qualifications, their test scores, their expertise, their background, affirmative action matters, things like that," Tr. 68 (quoted *ante*, at 625; *ante*, at 655 (O'CONNOR, J., concurring in judgment)). It was evidently enough for Graebner to know that both candidates (in the words of Johnson's counsel, to which Graebner assented) "met the M. Q.'s, the minimum. Both were minimally qualified." Tr. 25. When asked whether he had "any basis," *ibid.*, for determining whether one of the candidates was more qualified than the other, Graebner candidly answered, "No. . . . As I've said, they both appeared, and my conversations with people tended to corroborate, that they were both capable of performing the work." *Ibid.*

After a 2-day trial, the District Court concluded that Diane Joyce's gender was *"the determining factor,"* App. to Pet. for Cert. 4a, in her selection for the position. Specifically, it found that "[b]ased upon the examination results and the departmental interview, [Mr. Johnson] was more qualified for

"A. Mr. Morton was less interested in the particular individual; he felt that this was an opportunity for us to take a step toward meeting our affirmative action goals, and because there was only one person on the [eligibility] list who was one of the protected groups, he felt that this afforded us an opportunity to meet those goals through the appointment of that member of a protected group." Tr. 16–18.

the position of Road Dispatcher than Diane Joyce," *id.*, at 12a; that "[b]ut for [Mr. Johnson's] sex, male, he would have been promoted to the position of Road Dispatcher," *id.*, at 13a; and that "[b]ut for Diane Joyce's sex, female, she would not have been appointed to the position . . . ." *Ibid.* The Ninth Circuit did not reject these factual findings as clearly erroneous, nor could it have done so on the record before us. We are bound by those findings under Federal Rule of Civil Procedure 52(a).

## II

The most significant proposition of law established by today's decision is that racial or sexual discrimination is permitted under Title VII when it is intended to overcome the effect, not of the employer's own discrimination, but of societal attitudes that have limited the entry of certain races, or of a particular sex, into certain jobs. Even if the societal attitudes in question consisted exclusively of conscious discrimination by other employers, this holding would contradict a decision of this Court rendered only last Term. *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), held that the objective of remedying societal discrimination cannot prevent remedial affirmative action from violating the Equal Protection Clause. See *id.*, at 276; *id.*, at 288 (O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 295 (WHITE, J., concurring in judgment). While Mr. Johnson does not advance a constitutional claim here, it is most unlikely that Title VII was intended to place a *lesser* restraint on discrimination by public actors than is established by the Constitution. The Court has already held that the prohibitions on discrimination in Title VI, 42 U. S. C. § 2000d, are at least as stringent as those in the Constitution. See *Regents of University of California* v. *Bakke*, 438 U. S. 265, 286–287 (1978) (opinion of POWELL, J.) (Title VI embodies constitutional restraints on discrimination); *id.*, at 329–340 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) (same); *id.*, at 416 (opinion of

STEVENS, J., joined by Burger, C. J., and Stewart and REHNQUIST, JJ.) (Title VI "has independent force, with language and emphasis *in addition to* that found in the Constitution") (emphasis added). There is no good reason to think that Title VII, in this regard, is any different from Title VI.[3] Because, therefore, those justifications (*e. g.*, the remedying of past societal wrongs) that are inadequate to insulate discriminatory action from the racial discrimination prohibitions of the Constitution are also inadequate to insulate it from the racial discrimination prohibitions of Title VII; and because the portions of Title VII at issue here treat race and sex equivalently; *Wygant*, which dealt with race discrimination, is fully applicable precedent, and is squarely inconsistent with today's decision.[4]

---

[3] To support the proposition that Title VII is more narrow than Title VI, the majority repeats the reasons for the dictum to that effect set forth in *Steelworkers v. Weber*, 443 U. S. 193, 206, n. 6 (1979)—a case which, as JUSTICE O'CONNOR points out, *ante*, at 651–652, could reasonably be read as consistent with the constitutional standards of *Wygant*. Those reasons are unpersuasive, consisting only of the existence in Title VII of 42 U. S. C. § 2000e–2(j) (the implausibility of which, as a *restriction* upon the scope of Title VII, was demonstrated by CHIEF JUSTICE REHNQUIST's literally unanswered *Weber* dissent) and the fact that Title VI pertains to recipients of federal funds while Title VII pertains to employers generally. The latter fact, while true and perhaps interesting, is not conceivably a reason for giving to virtually identical categorical language the interpretation, in one case, that intentional discrimination is forbidden, and, in the other case, that it is not. Compare 42 U. S. C. § 2000d ("No person . . . shall, on the ground of race, color, or national origin, be . . . subjected to discrimination"), with § 2000e–2(a)(1) (no employer shall "discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin").

[4] JUSTICE O'CONNOR's concurrence at least makes an attempt to bring this Term into accord with last. Under her reading of Title VII, an employer may discriminate affirmatively, so to speak, if he has a "firm basis" for believing that he might be guilty of (nonaffirmative) discrimination under the Act, and if his action is designed to remedy that suspected prior discrimination. *Ante*, at 649. This is something of a halfway house between leaving employers scot-free to discriminate against disfavored

Likewise on the assumption that the societal attitudes relied upon by the majority consist of conscious discrimination by employers, today's decision also disregards the limitations carefully expressed in last Term's opinions in *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986). While those limitations were dicta, it is remarkable to see them so readily (and so silently) swept away. The question in *Sheet Metal Workers* was whether the remedial provision of Title VII, 42 U. S. C. § 2000e–5(g), empowers courts to order race-conscious relief for persons who were not identifiable victims of discrimination. Six Members of this Court concluded that it does, *under narrowly confined circumstances.* The plurality opinion for four Justices found that race-conscious relief could be ordered at least when "an employer or a labor union has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination." 478 U. S., at 445 (opinion of BRENNAN, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ.). See also *id.*, at 476. JUSTICE POWELL concluded that race-conscious relief can be ordered "in cases involv-

---

groups, as the majority opinion does, and prohibiting discrimination, as do the words of Title VII. In the present case, although the District Court found that in fact no sex discrimination existed, JUSTICE O'CONNOR would find a "firm basis" for the agency's *belief* that sex discrimination existed in the "inexorable zero": the complete absence, prior to Diane Joyce, of any women in the Agency's skilled positions. There are two problems with this: First, even positing a "firm basis" for the Agency's belief in prior discrimination, as I have discussed above the plan was patently not *designed to remedy* that prior discrimination, but rather to establish a sexually representative work force. Second, even an absolute zero is not "inexorable." While it may inexorably provide "firm basis" for belief in the mind of an outside observer, it cannot conclusively establish such a belief *on the employer's part*, since he may be aware of the particular reasons that account for the zero. That is quite likely to be the case here, given the nature of the jobs we are talking about, and the list of *"Factors Hindering Goal Attainment"* recited by the Agency plan. See *supra*, at 622. The question is in any event one of fact, which, if it were indeed relevant to the outcome, would require a remand to the District Court rather than an affirmance.

ing particularly egregious conduct," *id.*, at 483 (concurring in part and concurring in judgment), and JUSTICE WHITE similarly limited his approval of race-conscious remedies to "unusual cases." *Id.*, at 499 (dissenting). See also *Firefighters* v. *Cleveland*, 478 U. S. 501, 533 (1986) (WHITE, J., dissenting) ("I also agree with JUSTICE BRENNAN's opinion in *Sheet Metal Workers* . . . that in Title VII cases enjoining discriminatory practices and granting relief only to victims of past discrimination is the general rule, with relief for nonvictims being reserved for particularly egregious conduct"). There is no sensible basis for construing Title VII to permit employers to engage in race- or sex-conscious employment practices that courts would be forbidden from ordering them to engage in following a judicial finding of discrimination. As JUSTICE WHITE noted last Term:

"There is no statutory authority for concluding that if an employer desires to discriminate against a white applicant or employee on racial grounds he may do so without violating Title VII but may not be ordered to do so if he objects. In either case, the harm to the discriminatee is the same, and there is no justification for such conduct other than as a permissible remedy for prior racial discrimination practiced by the employer involved." *Id.*, at 533.

The Agency here was not seeking to remedy discrimination—much less "unusual" or "egregious" discrimination. *Firefighters*, like *Wygant*, is given only the most cursory consideration by the majority opinion.

In fact, however, today's decision goes well beyond merely allowing racial or sexual discrimination in order to eliminate the effects of prior societal *discrimination*. The majority opinion often uses the phrase "traditionally segregated job category" to describe the evil against which the plan is legitimately (according to the majority) directed. As originally used in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), that phrase described skilled jobs from which employers and un-

ions had systematically and intentionally excluded black workers—traditionally segregated jobs, that is, in the sense of conscious, exclusionary discrimination. See *id.*, at 197–198. But that is assuredly not the sense in which the phrase is used here. It is absurd to think that the nationwide failure of road maintenance crews, for example, to achieve the Agency's ambition of 36.4% female representation is attributable primarily, if even substantially, to systematic exclusion of women eager to shoulder pick and shovel. It is a "traditionally segregated job category" *not* in the *Weber* sense, but in the sense that, because of longstanding social attitudes, it has not been regarded *by women themselves* as desirable work. Or as the majority opinion puts the point, quoting approvingly the Court of Appeals: "'A plethora of proof is hardly necessary to show that women are generally underrepresented in such positions and that strong social pressures weigh against their participation.'" *Ante,* at 634, n. 12 (quoting 748 F. 2d 1308, 1313 (CA9 1984)). Given this meaning of the phrase, it is patently false to say that "[t]he requirement that the 'manifest imbalance' relate to a 'traditionally segregated job category' provides assurance . . . that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination." *Ante,* at 632. There are, of course, those who believe that the social attitudes which cause women themselves to avoid certain jobs and to favor others are as nefarious as conscious, exclusionary discrimination. Whether or not that is so (and there is assuredly no consensus on the point equivalent to our national consensus against intentional discrimination), the two phenomena are certainly distinct. And it is the alteration of social attitudes, rather than the elimination of discrimination, which today's decision approves as justification for state-enforced discrimination. This is an enormous expansion, undertaken without the slightest justification or analysis.

## III

I have omitted from the foregoing discussion the most obvious respect in which today's decision o'erleaps, without analysis, a barrier that was thought still to be overcome. In *Weber*, this Court held that a private-sector, affirmative-action training program that overtly discriminated against white applicants did not violate Title VII. However, although the majority does not advert to the fact, until today the applicability of *Weber* to public employers remained an open question. In *Weber* itself, see 443 U. S., at 200, 204, and in later decisions, see *Firefighters* v. *Cleveland, supra,* at 517; *Wygant*, 476 U. S., at 282, n. 9 (opinion of POWELL, J.), this Court has repeatedly emphasized that *Weber* involved only a private employer. See *Williams* v. *New Orleans*, 729 F. 2d 1554, 1565 (CA5 1984) (en banc) (Gee, J., concurring) ("Writing for the Court in *Weber*, Justice Brennan went out of his way, on at least eleven different occasions, to point out that what was there before the Court was *private* affirmative action") (footnote omitted). This distinction between public and private employers has several possible justifications. *Weber* rested in part on the assertion that the 88th Congress did not wish to intrude too deeply into private employment decisions. See 443 U. S., at 206–207. See also *Firefighters* v. *Cleveland, supra,* at 519–521. Whatever validity that assertion may have with respect to private employers (and I think it negligible), it has none with respect to public employers or to the 92d Congress that brought them within Title VII. See Equal Employment Opportunity Act of 1972, Pub. L. 92–261, § 2, 86 Stat. 103, 42 U. S. C. § 2000e(a). Another reason for limiting *Weber* to private employers is that state agencies, unlike private actors, are subject to the Fourteenth Amendment. As noted earlier, it would be strange to construe Title VII to permit discrimination by public actors that the Constitution forbids.

In truth, however, the language of 42 U. S. C. § 2000e–2 draws no distinction between private and public employers,

and the only good reason for creating such a distinction would be to limit the damage of *Weber*. It would be better, in my view, to acknowledge that case as fully applicable precedent, and to use the Fourteenth Amendment ramifications—which *Weber* did not address and which are implicated for the first time here—as the occasion for reconsidering and overruling it. It is well to keep in mind just how thoroughly *Weber* rewrote the statute it purported to construe. The language of that statute, as quoted at the outset of this dissent, is unambiguous: it is an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a). *Weber* disregarded the text of the statute, invoking instead its "'spirit,'" 443 U. S., at 201 (quoting *Holy Trinity Church* v. *United States*, 143 U. S. 457, 459 (1892)), and "practical and equitable [considerations] only partially perceived, if perceived at all, by the 88th Congress," 443 U. S., at 209 (BLACKMUN, J., concurring). It concluded, on the basis of these intangible guides, that Title VII's prohibition of intentional discrimination on the basis of race and sex does not prohibit intentional discrimination on the basis of race and sex, so long as it is "designed to break down old patterns of racial [or sexual] segregation and hierarchy," "does not unnecessarily trammel the interests of the white [or male] employees," "does not require the discharge of white [or male] workers and their replacement with new black [or female] hirees," "does [not] create an absolute bar to the advancement of white [or male] employees," and "is a temporary measure . . . not intended to maintain racial [or sexual] balance, but simply to eliminate a manifest racial [or sexual] imbalance." *Id.*, at 208. In effect, *Weber* held that the legality of intentional discrimination by private employers against certain disfavored groups or individuals is to be judged not by Title VII but by a judicially

crafted code of conduct, the contours of which are determined by no discernible standard, aside from (as the dissent convincingly demonstrated) the divination of congressional "purposes" belied by the face of the statute and by its legislative history. We have been recasting that self-promulgated code of conduct ever since—and what it has led us to today adds to the reasons for abandoning it.

The majority's response to this criticism of *Weber, ante,* at 629, n. 7, asserts that, since "Congress has not amended the statute to reject our construction, . . . we . . . may assume that our interpretation was correct." This assumption, which frequently haunts our opinions, should be put to rest. It is based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant. To make matters worse, it assays the current Congress' desires *with respect to the particular provision in isolation,* rather than (the way the provision was originally enacted) as part of a total legislative package containing many *quids pro quo.* Whereas the statute as originally proposed may have presented to the enacting Congress a question such as "Should hospitals be required to provide medical care for indigent patients, with federal subsidies to offset the cost?," the question theoretically asked of the later Congress, in order to establish the "correctness" of a judicial interpretation that the statute provides no subsidies, is simply "Should the medical care that hospitals are required to provide for indigent patients be federally subsidized?" Hardly the same question—and many of those legislators who accepted the subsidy provisions in order to gain the votes necessary for enactment of the care requirement would not vote for the subsidy in isolation, now that an unsubsidized care requirement is, thanks to the judicial opinion, safely on the books. But even accepting the flawed premise that the intent of the current Congress, with respect to the provision in isolation, is determinative, one must ignore rudimentary

principles of political science to draw any conclusions regarding that intent from the *failure* to enact legislation. The "complicated check on legislation," The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice. It is interesting to speculate on how the principle that congressional inaction proves judicial correctness would apply to another issue in the civil rights field, the liability of municipal corporations under § 1983. In 1961, we held that that statute did not reach municipalities. See *Monroe* v. *Pape*, 365 U. S. 167, 187 (1961). Congress took no action to overturn our decision, but we ourselves did, in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 663 (1978). On the majority's logic, *Monell* was wrongly decided, since Congress' 17 years of silence established that *Monroe* had not "misperceived the political will," and one could therefore "assume that [*Monroe's*] interpretation was correct." On the other hand, nine years have now gone by since *Monell*, and Congress *again* has not amended § 1983. Should we now "assume that [*Monell's*] interpretation was correct"? Rather, I think we should admit that vindication by congressional inaction is a canard.

JUSTICE STEVENS' concurring opinion emphasizes the "undoubted public interest in 'stability and orderly development of the law,'" *ante*, at 644 (citation omitted), that often requires adherence to an erroneous decision. As I have described above, however, today's decision is a demonstration not of stability and order but of the instability and unpredictable expansion which the substitution of judicial improvisation for statutory text has produced. For a number of reasons, *stare decisis* ought not to save *Weber*. First, this Court has applied the doctrine of *stare decisis* to civil rights

statutes less rigorously than to other laws. See *Maine* v. *Thiboutot*, 448 U. S. 1, 33 (1980) (POWELL, J., dissenting); *Monroe* v. *Pape, supra,* at 221–222 (Frankfurter, J., dissenting in part). Second, as JUSTICE STEVENS acknowledges in his concurrence, *ante,* at 644, *Weber* was itself a dramatic departure from the Court's prior Title VII precedents, and can scarcely be said to be "so consistent with the warp and woof of civil rights law as to be beyond question." *Monell* v. *New York City Dept. of Social Services, supra,* at 696. Third, *Weber* was decided a mere seven years ago, and has provided little guidance to persons seeking to conform their conduct to the law, beyond the proposition that Title VII does not mean what it says. Finally, "even under the most stringent test for the propriety of overruling a statutory decision . . .— 'that it appear beyond doubt . . . that [the decision] misapprehended the meaning of the controlling provision,'" 436 U. S., at 700 (quoting *Monroe* v. *Pape, supra,* at 192 (Harlan, J., concurring)), *Weber* should be overruled.

In addition to complying with the commands of the statute, abandoning *Weber* would have the desirable side effect of eliminating the requirement of willing suspension of disbelief that is currently a credential for reading our opinions in the affirmative-action field—from *Weber* itself, which demanded belief that the corporate employer adopted the affirmative-action program "voluntarily," rather than under practical compulsion from government contracting agencies, see 443 U. S., at 204; to *Bakke,* a Title VI case cited as authority by the majority here, *ante,* at 638, which demanded belief that the University of California took race into account as merely one of the many diversities to which it felt it was educationally important to expose its medical students, see 438 U. S., at 311–315; to today's opinion, which—in the face of a plan obviously designed to force promoting officials to prefer candidates from the favored racial and sexual classes, warning them that their "personal commitment" will be determined by how successfully they "attain" certain numerical goals,

and in the face of a particular promotion awarded to the less qualified applicant by an official who "did little or nothing" to inquire into sources "critical" to determining the final candidates' relative qualifications other than their sex—in the face of all this, demands belief that we are dealing here with no more than a program that "merely authorizes that consideration be given to affirmative action concerns when evaluating qualified applicants." *Ante*, at 638. Any line of decisions rooted so firmly in naiveté must be wrong.

The majority emphasizes, as though it is meaningful, that "*No* persons are automatically excluded from consideration; *all* are able to have their qualifications weighed against those of other applicants." *Ibid.* One is reminded of the exchange from Shakespeare's King Henry the Fourth, Part I:

> "GLENDOWER: I can call Spirits from the vasty Deep.
> "HOTSPUR: Why, so can I, or so can any man. But will they come when you do call for them?" Act III, Scene I, lines 53–55.

Johnson was indeed entitled to have his qualifications weighed against those of other applicants—but more to the point, he was virtually assured that, after the weighing, if there was any minimally qualified applicant from one of the favored groups, he would be rejected.

Similarly hollow is the Court's assurance that we would strike this plan down if it "failed to take distinctions in qualifications into account," because that "would dictate mere blind hiring by the numbers." *Ante*, at 636. For what the Court means by "taking distinctions in qualifications into account" consists of no more than eliminating from the applicant pool those who are not even *minimally qualified* for the job. Once that has been done, once the promoting officer assures himself that all the candidates before him are "M. Q.'s" (minimally qualifieds), he can then ignore, as the Agency Director did here, how much better than minimally qualified some of the candidates may be, and can proceed to appoint

from the pool solely on the basis of race or sex, until the affirmative-action "goals" have been reached. The requirement that the employer "take distinctions in qualifications into account" thus turns out to be an assurance, not that candidates' comparative merits will always be considered, but only that none of the successful candidates selected over the others solely on the basis of their race or sex will be utterly unqualified. That may be of great comfort to those concerned with American productivity; and it is undoubtedly effective in reducing the effect of affirmative-action discrimination upon those in the upper strata of society, who (unlike road maintenance workers, for example) compete for employment in professional and semiprofessional fields where, for many reasons, including most notably the effects of past discrimination, the numbers of "M. Q." applicants from the favored groups are substantially less. But I fail to see how it has any relevance to whether selecting among final candidates solely on the basis of race or sex is permissible under Title VII, which prohibits discrimination on the basis of race or sex.[5]

Today's decision does more, however, than merely reaffirm *Weber*, and more than merely extend it to public actors. It is impossible not to be aware that the practical effect of our holding is to accomplish *de facto* what the law—in language

---

[5] In a footnote purporting to respond to this dissent's (nonexistent) "predict[ion] that today's decision will loose a flood of 'less qualified' minorities and women upon the work force," *ante*, at 641, n. 17, the majority accepts the contention of the American Society for Personnel Administration that there is no way to determine who is the best qualified candidate for a job such as Road Dispatcher. This effectively constitutes appellate reversal of a finding of fact by the District Court in the present case ("[P]laintiff was more qualified for the position of Road Dispatcher than Diane Joyce," App. to Pet. for Cert. 12a). More importantly, it has staggering implications for future Title VII litigation, since the most common reason advanced for failing to hire a member of a protected group is the superior qualification of the hired individual. I am confident, however, that the Court considers this argument no more enduring than I do.

even plainer than that ignored in *Weber,* see 42 U. S. C. § 2000e–2(j)—forbids anyone from accomplishing *de jure:* in many contexts it effectively *requires* employers, public as well as private, to engage in intentional discrimination on the basis of race or sex. This Court's prior interpretations of Title VII, especially the decision in *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971), subject employers to a potential Title VII suit whenever there is a noticeable imbalance in the representation of minorities or women in the employer's work force. Even the employer who is confident of ultimately prevailing in such a suit must contemplate the expense and adverse publicity of a trial, because the extent of the imbalance, and the "job relatedness" of his selection criteria, are questions of fact to be explored through rebuttal and counterrebuttal of a "prima facie case" consisting of no more than the showing that the employer's selection process "selects those from the protected class at a 'significantly' lesser rate than their counterparts." B. Schlei & P. Grossman, Employment Discrimination Law 91 (2d ed. 1983). If, however, employers are free to discriminate through affirmative action, without fear of "reverse discrimination" suits by their nonminority or male victims, they are offered a threshold defense against Title VII liability premised on numerical disparities. Thus, after today's decision the *failure* to engage in reverse discrimination is economic folly, and arguably a breach of duty to shareholders or taxpayers, wherever the cost of anticipated Title VII litigation exceeds the cost of hiring less capable (though still minimally capable) workers. (This situation is more likely to obtain, of course, with respect to the least skilled jobs—perversely creating an incentive to discriminate against precisely those members of the nonfavored groups *least* likely to have profited from societal discrimination in the past.) It is predictable, moreover, that this incentive will be greatly magnified by economic pressures brought to bear by government contracting agencies upon employers who refuse to discriminate in the fashion

we have now approved. A statute designed to establish a color-blind and gender-blind workplace has thus been converted into a powerful engine of racism and sexism, not merely *permitting* intentional race- and sex-based discrimination, but often making it, through operation of the legal system, practically compelled.

It is unlikely that today's result will be displeasing to politically elected officials, to whom it provides the means of quickly accommodating the demands of organized groups to achieve concrete, numerical improvement in the economic status of particular constituencies. Nor will it displease the world of corporate and governmental employers (many of whom have filed briefs as *amici* in the present case, all on the side of Santa Clara) for whom the cost of hiring less qualified workers is often substantially less—and infinitely more predictable—than the cost of litigating Title VII cases and of seeking to convince federal agencies by nonnumerical means that no discrimination exists. In fact, the only losers in the process are the Johnsons of the country, for whom Title VII has been not merely repealed but actually inverted. The irony is that these individuals—predominantly unknown, unaffluent, unorganized—suffer this injustice at the hands of a Court fond of thinking itself the champion of the politically impotent. I dissent.