# IN THE SUPREME COURT OF IOWA

No. 22–2100

Submitted March 21, 2024—Filed May 10, 2024

**STATE OF IOWA,**

    Appellee,

vs.

**BRANDON WILLIAM LEE,**

    Appellant.

---

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

The defendant appeals his conviction and sentence for two counts of robbery in the first degree, willful injury causing serious injury, willful injury causing bodily injury, theft in the first degree, and impersonating a public official. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, and McDonald, JJ., joined, and in which May, J., joined except as to the court's reliance on the doctrine of legislative acquiescence. McDermott, J., filed a dissenting opinion, in which Oxley, J., joined as to part I, and in which May, J., joined as to part II.

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Anagha Dixit (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

The defendant was convicted of, among other things, two counts of first-degree robbery pursuant to Iowa Code section 711.1 (2022) when he assaulted a husband and wife in their home in order to steal $50,000 out of their safe. On appeal, the defendant asserts there was insufficient evidence to sustain a conviction for two counts of first-degree robbery. We disagree. The evidence is sufficient to conclude that the defendant intended to commit two separate and distinct thefts. Therefore, we affirm both convictions and sentences for first-degree robbery.

## I. Background Facts and Proceedings.

On the evening of January 9, 2022, Sandra (Sandy) and Joeseph (Joe) Henderson (collectively "the Hendersons") were watching television when there was a knock at their door. At the door was the defendant, Brandon Lee, a stranger to the Hendersons. The defendant was wearing a badge around his neck. He introduced himself as a law enforcement officer and stated he was investigating the Henderson's son, Alan. Sandy let him in. The defendant told the Hendersons he had received a report that they had assaulted Alan. Sandy denied the accusation, and the defendant began yelling at her. Registering that something may be suspicious, Sandy asked him for his name. The defendant then punched Sandy in the side of the head and knocked her to the floor. He tried to tie Sandy's hands behind her back, but Joe attempted to stop him from doing so. As a result, the defendant pushed Joe back into his recliner. Sandy then stood up, and the defendant pushed her onto the couch.

The defendant went to the front door and stated, "[Y]ou guys can come in now," but no one entered the home. He then fired his gun at a window between Joe and Sandy. The defendant demanded to know where their safe was and

yelled, "[G]ive me the fucking money." Sandy told him the safe was in the basement. The defendant demanded Joe open the safe. Joe resisted, and the defendant began beating him. Sandy tried to call 911 but the defendant threw her against the front door with enough force for the outside surveillance camera to capture the door visibly moving upon impact. He then punched her, pointed his gun in her face and stated, "I'm going to kill you, bitch, I'm going to kill both of you." The defendant walked back to Joe and began to drag him down the basement stairs. Sandy was able to escape the home through the garage and ran shoeless through the snow to a neighbor's house. The neighbor called 911. When the police arrived, the defendant was gone.

After taking the money from the safe, the defendant left the Henderson's home and made a series of stops to several different acquaintances' houses. At one house he discarded some of his clothes, his boots, the fake badge, and license plates. All items were recovered by the police. At another house he used a phone to try and find a ride. At a third house, an acquaintance provided the defendant with a change of clothes. However, that individual sensed something was wrong and decided to preserve anything the defendant touched by placing the items in a bin and later providing the items to law enforcement. The defendant was then picked up by two friends to be taken back to his home in Cedar Rapids. During this drive through Linn County, the defendant was hyper-focused on ensuring the driver followed all traffic laws and requested they not stop in Marion for gas due to the heavy police presence in Marion. When he was eventually dropped off at his home, the defendant placed a bag of bullets in one of the friend's pockets, which she then handed to the second friend, who subsequently provided the bullets to law enforcement.

After the incident, the Hendersons were transported to the hospital. Sandy suffered a laceration on her scalp that was closed with staples and had bruising

around her left eye. Joe sustained a broken upper jaw, a fracture behind his eyes, a cheekbone fracture, a midface fracture, and a broken nose. Due to the fractures, Joe was unable to chew solid food for several weeks. Joe also sustained a laceration on his scalp that required stitches, several contusions and abrasions on the back of his arms and forearms, and contusions from his chest area into the mid-back area. Prior to the incident, Joe had been suffering from colon cancer and Lewy Body dementia. His dementia progressed and Joe was moved to an assisted living facility on February 16, 2022, barely a month after the attack, where he later passed away due to complications from cancer.

The investigation revealed that $50,000 from the Henderson's safe was missing and that the DNA on the recovered boots matched the DNA of both the defendant and Joe. The money was never recovered. The defendant was charged with two counts of robbery in the first degree, two counts of willful injury causing serious injury, theft in the first degree, and impersonating a public official. A jury trial commenced on July 12, 2022. The defendant moved for a judgment of acquittal, which was denied on all counts but one. The court found insufficient evidence of a serious injury to Sandy and required the charge to be submitted to the jury as willful injury causing bodily injury. The jury found the defendant guilty of all six charges.

The defendant was sentenced to twenty-five years for each conviction of robbery in the first degree. For the offense of willful injury causing serious injury to Joe, the defendant was sentenced to ten years. For the willful injury causing bodily injury to Sandy, the defendant was sentenced to five years. For theft in the first degree, the defendant was sentenced to ten years. For impersonating a public official, the defendant was sentenced to two years. The sentences for the two robbery convictions were ordered to be served consecutively, for a total of

fifty years, with a minimum sentence of thirty years before being eligible for parole. The remaining sentences were ordered to be served concurrently to each other and consecutively to the robbery convictions. The defendant timely appealed.

## II. Standard of Review.

We generally review claims of an illegal sentence for correction of errors at law. *State v. Petty*, 925 N.W.2d 190, 195 (Iowa 2019). A defendant is permitted to challenge an illegal sentence at any time. *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009); Iowa R. Crim. P 2.24(5)(*a*) (2022) ("The court may correct an illegal sentence at any time."). "An illegal sentence is a sentence that is not permitted by statute." *State v. Copenhaver*, 844 N.W.2d 442, 447 (Iowa 2014). "If the legislature criminalizes two separate and distinct acts, separate sentences on each act are not illegal." *Id.* To determine what conduct the legislature criminalized, we look at the "unit of prosecution the legislature intended in enacting the statute." *Id.*

We review sufficiency of the evidence claims for correction of errors at law. *State v. Mathis*, 971 N.W.2d 514, 516 (Iowa 2022). The jury's verdict is binding if it is supported by substantial evidence. *Id.* "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* at 516–17. To determine whether the jury's verdict is supported by substantial evidence, "we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.' " *Id.* at 517 (quoting *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005)).

## III. Analysis.

On appeal, the defendant argues that we should overrule *State v. Copenhaver*, 844 N.W.2d 442, and apply the single-larceny rule, which states that "the

theft of property belonging to two different persons at the same place and at the same time constitutes one single larceny," *id.* at 450 n.2. The defendant further argues that even under *Copenhaver*, he did not have the intent to commit two separate and distinct thefts, and therefore, the evidence was insufficient to support two separate robbery convictions. As a result, the defendant contends that the district court imposed an illegal sentence. We decline to overrule *Copenhaver* and find there is sufficient evidence that the defendant intended to commit two separate and distinct thefts.

**A. Stare Decisis.** We must first begin our discussion by considering our commitment to stare decisis. *See State v. Williams*, 895 N.W.2d 856, 859 (Iowa 2017). Our existing caselaw can be applied to resolve this case; however, this caselaw is being challenged as incorrect. "We do not overturn our precedents lightly and will not do so absent a showing the prior decision was clearly erroneous." *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 83 (Iowa 2022) (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005)).

The State's argument in support of overturning *Copenhaver* is that its outcome "leads to problematic results." However, such an argument amounts to no more than the assertion that *Copenhaver* was wrongly decided. The State has offered no explanation as to how the legal framework of *Copenhaver* is clearly erroneous. The State merely expresses displeasure with the outcome of the case, which is not a sufficient justification for us to depart from our prior holding.

The defendant argues that we should overrule the claim in *Copenhaver* that the single-larceny rule no longer applies after the enactment of Iowa Code section 714.3. Iowa Code section 714.3(2) states:

> If money or property is stolen from the same person or location by two or more acts, or from different persons by two or more acts which occur in approximately the same location or time period, or from different locations by two or more acts within a thirty-day period, so that the thefts are attributable to a single scheme, plan, or

> conspiracy, these acts may be considered a single theft and the value may be the total value of all the property stolen.

The defendant contends that section 714.3 did not replace the single-larceny rule but instead provides "the state the *option* to pursue higher degrees of theft by aggregating the value of each individual taking." *See also State v. Chrisman*, 514 N.W.2d 57, 58–60 (Iowa 1994) (interpreting the effect of Iowa Code section 714.3 and determining whether the single-larceny rule still applies).

"[W]e presume the legislature is aware of our cases that interpret its statutes. When many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation." *Doe v. New London Comm. Sch. Dist.*, 848 N.W.2d 347, 355 (Iowa 2014) (quoting *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013)). Stare decisis "is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature." *Bd. of Water Works Trs. v. SAC Cnty. Bd. of Supervisors*, 890 N.W.2d 50, 61 (Iowa 2017) (quoting *In re Est. of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011)). Since our decision in *State v. Chrisman* in 1994 and *Copenhaver* in 2014, the legislature has neither amended section 714.3 nor statutorily enacted the single-larceny rule. Thus, we presume the legislature has acquiesced in our interpretation of the effect of section 714.3 and the applicability of the single-larceny rule. *See Doe*, 848 N.W.2d at 355. Accordingly, despite the State and the defendant's arguments, we decline to overrule *Copenhaver* and hold it is still the controlling law and applies to the facts of the case here.

**B. Error Preservation.** As a threshold matter, the State contends the defendant's argument that he did not have the intent to commit two separate and distinct thefts was not properly preserved because he did not object to the jury instructions. The first instruction at issue stated:

The State must prove all of the following numbered elements of Robbery in the First Degree:

1. On or about the 9th day of January, 2022, the defendant had the specific intent to commit a theft.

2. To carry out his intention to assist or further the commission of the intended theft or assist him in escaping from the scene, with or without the stolen property, the defendant:

a. Committed an assault on Joseph Henderson . . . or

b. Threatened Joseph Henderson with, or purposely put Joseph Henderson in fear of immediate serious injury, or

c. Threatened to immediately commit a forcible felony.

3. The defendant:

a. Purposely inflicted or attempted to inflict a serious injury on Joseph Henderson or

b. Was armed with a dangerous weapon.

The second instruction at issue was identical to the instruction above, except it referred to Sandy in place of Joe. Specifically, it stated:

The State must prove all of the following numbered elements of Robbery in the First Degree:

1. On or about the 9th day of January, 2022, the defendant had the specific intent to commit a theft.

2. To carry out his intention to assist or further the commission of the intended theft or assist him in escaping from the scene, with or without the stolen property, the defendant:

a. Committed an assault on Sandra Henderson . . . or

b. Threatened Sandra Henderson with, or purposely put Sandra Henderson in fear of immediate serious injury[,] or

c. Threatened to immediately commit a forcible felony.

3. The defendant:

a. Purposely inflicted or attempted [to] inflict a serious injury on Sandra Henderson or

b. Was armed with a dangerous weapon.

To have preserved his argument that the State failed to prove the defendant had the specific intent to commit two separate and distinct thefts, the State argues that the defendant needed to have objected to the above jury instructions. We disagree. First, the defendant moved for a judgment of acquittal at the end of the presentation of evidence, arguing that the State did not prove he had the intent to commit two separate and distinct thefts. The motion was denied. Second, if the State did, in fact, fail to prove the defendant had the intent to commit two separate and distinct thefts, the resulting sentence for two robberies would be illegal. A defendant can challenge an illegal sentence at any time, including for the first time on appeal. *See Bruegger*, 773 N.W.2d at 869. Therefore, we hold that the defendant's argument was properly preserved.

**C. Illegal Sentence.** In *Copenhaver*, we determined that "the unit of prosecution for robbery requires the defendant to have the intent to commit a theft, coupled with any of the following—commits an assault upon another, threatens another with or purposely puts another in fear of immediate serious injury, or threatens to commit immediately any forcible felony." 844 N.W.2d at 449. Thus, to support two convictions of robbery, the State must have proved that the defendant "had the intent to commit two separate and distinct thefts, with each theft accompanied by any of the actions contained in Iowa Code section 711.1." *Id.* At trial, the defendant admitted to assaulting both Sandy and Joe; therefore, it is evident that the theft was accompanied by an action contained in section 711.1. As a result, the only issue on appeal is whether the defendant had the intent to commit two separate and distinct thefts. Sufficient evidence of such intent is present here.

To determine if substantial evidence supports a defendant's conduct as separate and distinct or one continuous act, we look at the following factors: "(1) the time interval occurring between the successive actions of the defendant,

(2) the place of the actions, (3) the identity of the victims, (4) the existence of an intervening act, (5) the similarity of defendant's actions, and (6) defendant's intent at the time of his actions." *Copenhaver*, 844 N.W.2d at 449–50 (quoting *State v. Ross*, 845 N.W.2d 692, 705 (Iowa 2014)).

Applying the factors here, the incident occurred in one location: the Henderson's home. Joe and Sandy were husband and wife and owned the property in the safe. The defendant admitted to having the intent to physically assault Joe and substantial evidence was presented to show he had the intent to assault Sandy. He assaulted both Joe and Sandy when they resisted his attempts to locate the safe. When Sandy tried to call for help, the defendant punched, pushed, and shoved both Joe and Sandy. While the entire incident took place within seven minutes, there were breaks between the defendant's actions. In *Copenhaver*, we determined that the time it took for the defendant to move from one teller to the next teller left an interval of time between each act, thereby showing the defendant had the intent to commit two separate and distinct thefts. *Id.* at 450. The same is true here. The assaults did not occur in one continuous act. The defendant would assault one of the Hendersons, pause, and then begin assaulting the other. During one break in action, the defendant went to the front door and invited other individuals into the home. During another break, the defendant verbally accosted Sandy. As in *Copenhaver*, each of these pauses left an interval of time between the defendant's actions. *See id.* Therefore, there is substantial evidence that the defendant committed separate and distinct acts rather than one continuous act.

Additionally, theft occurs when a person "[t]akes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof." Iowa Code § 714.1(1). Substantial evidence was presented to support the conclusion that the defendant had the intent to commit

two separate thefts. The money in the safe was owned by both Sandy and Joe. The defendant repeatedly asked both Joe and Sandy where the safe was and demanded that Joe open it for him. The money was in the safe prior to the altercation, and upon the end of the altercation, the money was gone. Therefore, sufficient evidence was presented to show the defendant had the intent to, and did in fact, commit two separate and distinct thefts: one theft against Sandy, and one theft against Joe. As a result, the sentence imposed is not illegal.

## IV. Conclusion.

Because the evidence is sufficient to establish that the defendant intended to commit two separate and distinct thefts, we affirm both convictions and sentences for first-degree robbery.

**AFFIRMED.**

Waterman, Mansfield, and McDonald, JJ., join this opinion, and May, J., joins except as to the court's reliance on the doctrine of legislative acquiescence. McDermott, J., files a dissenting opinion, in which Oxley, J., joins as to part I, and in which May, J., joins as to part II.

**McDERMOTT, Justice (dissenting).**

I.

The majority finds that Lee's actions constituted two separate thefts and thus affirms his convictions for two separate robberies. In my review of the record, I can discern only one theft. Because one theft can give rise to only one robbery conviction, regardless of the number of assaults committed to further that theft, I must respectfully dissent.

The robbery statute provides in relevant part:

> 1. A person commits a robbery when, having the intent to commit a theft, the person does any of the following acts to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property:
>
> *a.* Commits an assault upon another.
>
> *b.* Threatens another with or purposely puts another in fear of immediate serious injury.
>
> *c.* Threatens to commit immediately any forcible felony.

Iowa Code § 711.1(1) (2022). The elements of robbery are relatively straightforward. The state must prove that a defendant (1) intended to commit a theft, and (2) performed any of the listed actions in furtherance of that theft. *See id.* The difficult questions in this case center on whether the State needed to prove that Lee intended to commit *two thefts* to support the two robbery convictions and, if so, whether the evidence established two thefts.

We answered the question of whether multiple counts of robbery require proof of multiple thefts in *State v. Copenhaver*, 844 N.W.2d 442 (Iowa 2014). That case centered on whether a defendant committed two counts of robbery during a bank holdup when the defendant demanded and received cash from a bank

teller at that teller's station and then demanded and received cash from a different teller at another station. *Id.* at 445.

We analyzed in *Copenhaver* whether the robbery statute permits multiple robbery convictions where a defendant commits multiple assaults but intends to commit only a single theft, stating:

> If a defendant intends to commit only one theft, and the defendant does one or more of the following—commits an assault upon another, threatens another with or purposely puts another in fear of immediate serious injury, or threatens to commit immediately any forcible felony—only one robbery has occurred. This is true even if the defendant commits multiple assaults or a single assault on one person and threatens other persons with or purposely puts another in fear of immediate serious injury while intending to commit a single theft.

*Id.* at 449. We concluded that the facts established two thefts based on the defendant's separate demand for and receipt of cash from the two bank tellers at their separate stations. *Id.* at 452. We thus affirmed both robbery convictions. *Id.*

But the facts in this case, in my view, simply don't support a conclusion that Lee intended to commit two separate thefts from the Hendersons. As the State summarizes in its brief, after Lee entered the home, he "asked Sandy and Joe about their safe, demanding to know where it and the money were kept." He intended to steal one thing at one location at one time. Although both Sandy and Joe jointly owned the money in the safe, "the stealing of property from different owners at the same time and at the same place constitutes but one larceny." *State v. Chrisman*, 514 N.W.2d 57, 59 (Iowa 1994) (quoting *State v. Cabbell*, 252 N.W.2d 451, 453 (Iowa 1977)).

The trial transcript suggests that Lee's assaults on Sandy and Joe happened in rapid succession. When Lee pulled his gun, he fired a shot at the window between where Sandy and Joe sat. Lee seemingly moved from assaulting

one to the other and back again, repeatedly shifting his attention between them without any meaningful break in the action. Yet nothing about the separate assaults on Joe and Sandy permits a conclusion that Lee intended to steal anything other than the money in the safe. As we said in *Copenhaver*, "If the defendant intends to commit only one theft, there can only be one robbery no matter how many assaults occur while the defendant intends to commit the theft." 844 N.W.2d at 449. The State charged Lee with only a single count of theft. The jury convicted Lee of only a single count of theft. The majority describes, at best, a break in action between *assaults* but not a break in action between *attempted thefts*, which is what we said was needed in *Copenhaver*. *See id.* at 450. If the money was all in Joe's pocket, Lee's conduct would have amounted to multiple assaults in support of his attempt to take money from Joe's pocket—i.e., one robbery. I see no difference between the money being in Joe's pocket and the money being in the safe.

Both parties in this case ask us to overrule *Copenhaver*, but for different reasons. The State argues that *Copenhaver* should be overruled because it mistakenly requires the State to prove a separate attempted theft to support each independent robbery conviction. It urges that nothing in the language of the robbery statute requires more than one theft to charge and convict a defendant for more than one robbery.

The majority purports to reject the State's request to overrule *Copenhaver*, concluding that the State failed to show that *Copenhaver*'s holding was clearly erroneous. I say "purports" because the majority says it rejects the State's argument, but its holding suggests otherwise since (for the reasons explained above) only one attempted theft occurred. In any event, I agree with the majority that we should reject the State's reading of § 711.1, based on both the analysis by the *Copenhaver* majority, *id.* at 448–49, and the reasons explained in Justice

Mansfield's separate writing in *Copenhaver, id.* at 452–56 (Mansfield, J., concurring in part and dissenting in part). I find Justice Mansfield's application of the rule of lenity particularly fitting here.

When ordinary attempts to interpret a criminal statute fail to resolve reasonable doubts about the unit of prosecution, an interpretation that affords less harsh treatment of the defendant prevails. *See State v. Muhlenbruch*, 728 N.W.2d 212, 216 (Iowa 2007). "[W]hen the government means to punish, its commands must be reasonably clear," and "[w]hen they are not clear, the consequences should be visited on the party more able to avoid and correct the effects of shoddy legislative drafting," namely, the state. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 299 (2012). The robbery statute in Iowa Code § 711.1 (referring to "the intent to commit a theft"), read with the definition of theft in § 714.1(1) (when a person "[t]akes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof"), leaves reasonable doubt about the unit of prosecution. *See Copenhaver*, 844 N.W.2d at 452–53. We thus must interpret it to provide that only one intended theft can result in only one robbery.

Because the State failed to establish that Lee intended to commit two separate thefts to support two robbery convictions as *Copenhaver* requires, and because the State failed to show that *Copenhaver*'s requirement on this point should be overruled, I would reverse the second robbery conviction.

## II.

I write further to address the basis for the majority's rejection of Lee's argument to overrule dicta in a footnote in *Copenhaver*. Lee argues that the footnote erroneously states that Iowa's theft statute, as enacted in Iowa Code § 714.3, did away with the "single-larceny rule" that existed under the common law. *See id.* at 450 n.2 (majority opinion). The majority—relying on the doctrine

of legislative acquiescence—rejects Lee's request to overrule *Copenhaver* on this point.

Legislative acquiescence, as the majority explains, assumes that when we have interpreted a statute in a case "without a legislative response," it means that "the legislature has acquiesced in our interpretation." *Doe v. New London Comm. Sch. Dist.*, 848 N.W.2d 347, 355 (Iowa 2014) (quoting *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013)). Here, this would mean that because the legislature didn't revise the theft statute after we made this particular statement in a footnote in *Copenhaver*, we can thus conclude that the single-larceny rule is no more.

The premises undergirding the doctrine of legislative acquiescence make any reliance on it a dubious proposition. One must first believe that legislators in later legislative sessions were even aware of the particular court ruling interpreting a statute. One must then accept that a later legislature—through *silence*—has the ability to interpret the meaning of statutory text that an earlier legislature passed into law. One must believe, for instance, that the 2022 legislature possesses some insight for us—indeed, a *conclusive* insight—about how statutory text enacted by the 1976 legislature should be interpreted, and that it communicates that insight by doing nothing. From there, one must further accept that the later legislature's failure to act must be viewed as agreement with the court's statutory interpretation in the earlier case. Despite potentially innumerable reasons for a legislature's failure to amend a particular statute, the legislative acquiescence doctrine assumes and assigns one, and only one, reason for it: wholehearted approval of the court's prior interpretation.

Justice Scalia excoriated the legislative acquiescence justification that the majority relies on today. *See Johnson v. Transp. Agency*, 480 U.S. 616, 671–72

(1987) (Scalia, J., dissenting). He maintained that a legislative-inaction-confirms-we-got-it-right assumption "haunts" judicial opinions and "should be put to rest." *Id.* at 671. "It is based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current [legislature] desires, rather than by what the law as enacted meant." *Id.* Worse, it draws conclusions about the current legislature's "desires *with respect to the particular provision in isolation,*" ignoring the legislative process's give-and-take required to create the "total legislative package" in which the isolated provision happens to reside. *Id.* The Constitution "creates an inertia" through its "complicated check on legislation" that, Justice Scalia argues, "makes it impossible to assert with any degree of assurance" that inaction "represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice." *Id.* at 672 (quoting *The Federalist No. 62*, at 378 (James Madison) (Clinton Rossiter ed., 1961)). According to Justice Scalia, "one must ignore rudimentary principles of political science to draw any conclusions regarding [a current legislature's] intent from the *failure* to enact legislation." *Id.* at 671–72.

What's more, courts interpret statutory language all the time. "Usually, silence can acquire meaning in an exchange only when a response is expected." Peter Tiersma, *The Language of Silence*, 48 Rutgers L. Rev. 1, 94 (1995). The notion implicit in legislative acquiescence—that we should *expect* a new legislative enactment each time the legislature has the slightest disagreement with one of our interpretations—is untethered from the real world. "If the courts routinely anticipated a response to all of their opinions, they would have to assume from the legislature's inaction that it was silently approving virtually every decision the courts made; this is highly unrealistic." *Id.* The doctrine's

shortcomings are easy to see when followed to their logical endpoint. "If the proposition were applied as a rule in every case involving statutory construction, no judicial construction of a statute could be overruled in the absence of legislative action." *Bronsen v. Dawes County*, 722 N.W.2d 17, 28 (Neb. 2006). A reader will not need to search hard to find evidence of our court overruling a prior statutory interpretation despite the legislature's inaction after our prior ruling.

Judge Easterbrook describes potentially antidemocratic consequences when courts base holdings on lawmakers' failure to act after a court interprets a statute. *See* Frank H. Easterbrook, *Stability and Reliability in Judicial Decisions*, 73 Cornell L. Rev. 422, 426–27 (1988). Legislative acquiescence assumes "that as soon as the judges have spoken, the decision of the past ceases to matter, and the only question is what the sitting Congress wishes. This simply denies the purpose of the enterprise: to enforce the decisions of a prior Congress." *Id.* at 426. Later lawmakers "may leave in place an interpretation of a law simply because today's coalitions are different. The failure of a different body to act hardly shows that the interpretation of what an earlier one did is 'right.' " *Id.* at 427. Judge Posner expressed a related view: "The deal is struck when the statute is enacted. If courts paid attention to subsequent expressions of legislative intent not embodied in any statute, they would be unraveling the deal that had been made; they would be breaking rather than enforcing the legislative contract." Richard A. Posner, *Economics, Politics, and the Reading of Statutes and the Constitution*, 49 U. Chi. L. Rev. 263, 275 (1982).

The mere fact that a legislature *could* take action "is no excuse for failing to overrule a statutory precedent of ours that is clearly wrong, for the realities of the legislative process often preclude readopting the original meaning of a statute that we have upset." *Clark v. Martinez*, 543 U.S. 371, 402 (2005) (Thomas, J.,

dissenting). If we erroneously interpreted § 714.3 in *Copenhaver,* then we should not let legislative inaction prevent us from remedying our error. "The court is always free to correct its own mistakes, and legislative inaction is not a bar to doing so." *State ex rel. Iowa Dep't of Health v. Van Wyk,* 320 N.W.2d 599, 607 (Iowa 1982) (en banc) (McCormick, J., dissenting).

Divining meaning from legislative inaction may be a useful fiction, but it's a fiction nonetheless, and a pernicious one at that, diverting us from the real work of statutory interpretation that courts are called to perform. Legislative acquiescence risks lulling us into complacency based on superstition that inaction equals approval. It should go without saying that our interpretation of a statute should be based on what the statute's text says and fairly implies, not on our guesswork about what a later legislature's inaction might mean. For all these reasons, I respectfully dissent.

Oxley, J., joins this dissent as to part I, and May, J., joins this dissent as to part II.